UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ELIZABETH E. BELIN
and CHRISTOPHER MITCHELL,
individually and on behalf of all                         CLASS ACTION
others similarly situated,                                (Jury Trial Demanded)

        Plaintiffs,

v.

HEALTH INSURANCE INNOVATIONS, INC.
and HEALTH PLAN INTERMEDIARIES
HOLDINGS, LLC,

        Defendants.

_____/

## CLASS ACTION COMPLAINT

Class Plaintiffs, ELIZABETH E. BELIN and CHRISTOPHER MITCHELL, file this

class action complaint individually and on behalf of all others similarly situated against

Defendants, HEALTH INSURANCE INNOVATIONS, INC. and HEALTH PLAN

INTERMEDIARIES HOLDINGS, LLC, and allege as follows:

## INTRODUCTION

1.    Unscrupulous health insurance scammers continue to besiege American

consumers.  One such scam involves the marketing and sale of "limited benefit indemnity plans"

and "medical discount plans."  These plans are not comprehensive, "major medical" insurance.

They do not comply with the Affordable Care Act ("ACA").  At best, they are supplemental

products that defray a fraction of the out-of-pocket costs, such as deductibles, coinsurance and

copays, that sometimes arise from ACA-compliant plans.  These products represent less than 1%

of the health insurance marketplace.

2.    Two groups of Florida companies, working together, defrauded hundreds of

thousands of consumers nationwide, by leading those consumers to believe that their limited benefit indemnity plans and medical discount plans were major medical insurance.  Recently, a federal judge, prompted by a Federal Trade Commission ("FTC") lawsuit, entered a series of orders restraining one of those companies, Simple Health, from conducting further business.  The court installed receiver Michael I. Goldberg, who found and reported that Simple Health was "largely a classic bait-and-switch scam whereby unwitting consumers are falsely led to believe that they are purchasing a [PPO] that is compliant with the [ACA], but in reality are sold limited benefit indemnity plans that are not compliant with the ACA."

3.      This lawsuit takes aim at the second group of companies that directed, aided and abetted the Simple Health fraud: Health Insurance Innovations, Inc. ("HIIQ") and Health Plan Intermediaries Holdings, LLC ("HPIH") (collectively, "Defendants").  Defendants developed the limited benefit indemnity plans and the distribution channel through which consumers were defrauded.  Defendants loaned Simple Health millions of dollars to fund its operations; trained Simple Health's sales agents; monitored Simple Health's compliance functions, including its sales calls; reviewed, edited and tacitly or expressly approved the fraudulent script used by Simple Health to sell the products; provided customer service to customers following those sales, listening to thousands of those customers complain that they had been defrauded; collected monthly premiums from those customers; accounted for, audited and distributed the commissions and proceeds of those sales; allowed dozens of Simple Health sales agents to register their licenses through Defendants; directed and paid for legal costs incurred by Simple Health arising out of dozens of regulatory investigations; and directed Simple Health to use Defendants' online platform to quote and sell Defendants' products.

4.      In connection with the fraudulent scheme, Defendants paid Simple Health

extremely generous commissions and plied it with millions of dollars in financing. As a result, Simple Health developed into Defendants' largest and most profitable third-party distributor of limited benefit indemnity plans, medical discount plans and other products, generating hundreds of millions of dollars in fees and premiums — nearly 50% of all revenues generated by Defendants.

5.      This happened by defrauding that vulnerable group of Americans who do not have comprehensive medical insurance. Consumers were told, through a uniform script read to them by Simple Health's sales agents, a set of lies and omissions that included, among other falsehoods, the misrepresentation that they were purchasing a "PPO" from a reputable, "A-rated" insurance carrier. In truth, consumers received "virtually worthless" limited indemnity plans and medical discount plans.

6.      For Defendants' knowing and substantial assistance to Simple Health, and for their part in the enterprise they developed and directed, Defendants must be held to account to consumers like Class Plaintiff Elizabeth Belin. Belin had been recently divorced, without insurance and suffering from a preexisting knee injury in early 2016 when she began looking for ACA-compliant healthcare. She found one of Simple Health's dozens of websites, which had misleading names like "Obamacare-healthquotes.com," "myobamacareapplication.com" and "healthinsurance2017deadline.com." Simple Health's sales agent told her that he was shopping among numerous PPOs of "A-rated carriers," and would find the best one for Belin at the best price. Reading from a script, the sales agent's misrepresentations and omissions led Belin to believe she was buying comprehensive medical insurance. Instead, she bought a limited benefit indemnity plan and medical discount plan (similar to a "buyer's club" card), as well as Accidental Death & Dismemberment ("AD&D") insurance that she never requested. She paid

an enrollment fee of $150 and a monthly premium of $238.77.  Belin later had knee replacement surgery, only to learn that the surgery was not covered.  She received bills in excess of $48,000, more than her annual salary.

7.     Chris Mitchell shared a similar experience.   An advocate for the homeless, Mitchell's employer did not offer health insurance benefits.   Mitchell purchased a limited indemnity plan and medical discount plan from Simple Health in early 2016 after listening to a sales agent read from the sales script that Simple Health read to Belin and the other class members.  He paid a $155 enrollment fee and a $206.90 monthly premium.  In early 2018, Mitchell was diagnosed with an aggressive form of cancer and was immediately scheduled for surgery.  Just days before that surgery, Mitchell's hospital told him that he had no insurance coverage.  Mitchell scrambled to come up with a down payment for the surgery, but ultimately received bills exceeding $40,000.  He described the difficulties caused by Simple Health and Defendants as oftentimes more difficult than fighting cancer.

## JURISDICTION AND VENUE

8.     <u>Subject Matter Jurisdiction</u>.  The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because (i) the matter in controversy exceeds $5 million, exclusive of interest and costs; (ii) there are members of the proposed Class (which is comprised of residents of all 50 states) who are citizens of different states than Defendants; and (iii) there are in the aggregate more than 100 members of the proposed class.  This Court also has federal question subject matter jurisdiction pursuant to 18 U.S.C. § 1964.

9.     <u>Personal Jurisdiction</u>.   This Court has specific personal jurisdiction over Defendants pursuant to Section 48.193(1)(a), Fla. Stat.:

      a.     Defendants maintain their headquarters and principal place of business in

Florida.  Both regularly and systematically operate, conduct, engage in and carry on a business or business venture in Florida, and have an office or agency in Florida;

b.      As further alleged in this Complaint, both Defendants committed one or more tortious acts within Florida; and

c.      Upon information and belief, Defendants own, use, possess and/or hold a mortgage or other lien on real property within Florida.

10.     This Court has general personal jurisdiction over Defendants pursuant to Section 48.193(2), Fla. Stat.  Defendants are engaged in substantial and not isolated activity within this state, as shown by, among other facts:

a.      Defendants' principal place of business is in Florida.

b.      From their office in Tampa, Defendants directed and/or aided and abetted the breach of fiduciary duty and fraudulent acts alleged herein through its knowing and substantial assistance of Simple Health.  From Simple Health's offices in South Florida, Simple Health contacted consumers throughout the country, primarily if not exclusively via telephone.  As further described below, during those phone calls Simple Health's agents, from offices in South Florida, made misrepresentations and omissions that induced Class Plaintiffs and class members to purchase Defendants' limited benefit indemnity plans.  During those calls, Simple Health processed (in Florida) Plaintiffs' and class members' payment of enrollment fees and first monthly premiums using Defendants' payment platform.

c.      Subsequent monthly premium payments by Class Plaintiffs and class members were collected by Defendants, which processed those payments in Florida.

d.      From their Florida offices, Defendants wired commissions to Simple

Health's offices in South Florida.

e.     Defendants also financed Simple Health's operations and growth by providing millions of dollars in "advanced commissions" and a $1 million bonus advance.  This financing was memorialized in loan agreements, a note and personal guaranties executed in Florida.

f.     Defendants and Simple Health provided customer service to Class Plaintiffs and class members from their offices in Florida.

g.     Defendants sent billing statements and other documents to Class Plaintiffs and class members from Defendants' offices in Florida.

11.     <u>Venue</u>.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because (i) a substantial part of the events or omissions giving rise to Class Plaintiffs' claims occurred in this District, and (ii) Defendants' contacts with this District would be sufficient to subject it to personal jurisdiction in this District if this District were a separate State.  Defendants regularly and systematically operate, conduct, engage in and carry on a business or business venture in this District, and have generated hundreds of thousands of dollars in revenues from consumers in this District.  Defendants committed one or more tortious acts within this District.  Defendants financed Simple Health's operations and took a mortgage or other lien on all of Simple Health's assets, including real property owned by Simple Health in this District.  Defendants' contacts within this District, including through its relationship with Simple Health as described in paragraph 10 above, were substantial and not isolated.

## **PARTIES**

12.     Plaintiff Elizabeth Belin is an individual and a resident of the state of Ohio.  Belin is a "person" under 18 U.S.C. § 1964.

6

13.     Plaintiff Christopher Mitchell is an individual and a resident of the state of Kansas.  Mitchell is a "person" under 18 U.S.C. § 1964.

14.     Defendant Health Insurance Innovations, Inc. ("HIIQ") is distributor of health and life insurance products.  HIIQ is a Delaware corporation based in Tampa, Florida.  HIIQ is publicly traded on NASDAQ under the stock symbol "HIIQ."  HIIQ is a holding company.  Its only material asset is the ownership of a 100% economic interest in Defendant Health Plan Intermediaries Holdings, LLC.  HIIQ receives distributions from Health Plan Intermediaries Holdings, LLC to pay taxes and other expenses.  HIIQ is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.

15.     Defendant Health Plan Intermediaries Holdings, LLC ("HPIH") is a Delaware limited liability company based in Tampa, Florida.  HPIH's members are (i) HIIQ; (ii) Health Plan Intermediaries Sub, LLC ("HPIS"), a Delaware limited liability company based in Tampa, Florida, whose sole manager/member, Michael Kosloske, is an individual who resides in Tampa, Florida; (iii) Health Plan Intermediaries, LLC ("HPI"), a Florida corporation based in Tampa, Florida, whose sole manager/member, Michael Kosloske, is an individual who resides in Tampa, Florida; and (iv) Gavin Southwell, an individual who resides in Tampa, Florida.  HPIH is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.

## RELEVANT NONPARTIES

16.     The nonparty entities listed in paragraphs 18 through 23 below are related entities that will be referred to collectively as "Simple Health."  These entities conducted business from the State of Florida through interrelated companies with common ownership, officers, managers and business functions.

17.     Defendants sold limited indemnity plans nationwide through Simple Health, with a significant percentage those plans sold to Florida consumers.  For example, in 2015, Simple Health sold 103,000 plans nationwide, with 10,524 (more than 10 percent) of those sold to Florida consumers.

18.     Simple Health Plans LLC ("Simple Health Plans") is a Florida limited liability company with its principal place of business in Hollywood, Florida.  At all times material to this Class Action Complaint, Simple Health Plans advertised, marketed, distributed and sold limited benefit plans and medical discount plans to consumers throughout the United States, including Class Plaintiffs and putative class members.

19.     Health Benefits One, LLC ("HBO"), is a Florida limited liability company with its principal place of business in Hollywood, Florida.  HBO also did business as Health Benefits Center, Simple Health, Simple Health Plans, Simple Insurance, Simple Insurance Plans, Simple Auto, Simple Home, Simple Home Plans, Simple Care, Simple Life and National Dental Savings.  At all times material to this Class Action Complaint, HBO advertised, marketed, distributed and sold limited benefit plans and medical discount plans to consumers throughout the United States, including Class Plaintiffs and putative class members.

20.     Health Center Management LLC ("HCM") is a Florida limited liability company with its principal place of business in Hollywood, Florida.  At all times material to this Class Action Complaint, HCM advertised, marketed, distributed and sold limited benefit plans and medical discount plans to consumers throughout the United States, including Class Plaintiffs and putative class members.

21.     Innovative Customer Care LLC ("ICC") is a Florida limited liability company with its principal place of business in Hollywood, Florida.  At all times material to this Class

Action Complaint, ICC advertised, marketed, distributed and sold limited benefit plans and medical discount plans to consumers throughout the United States, including Class Plaintiffs and putative class members.

22.     Simple Insurance Leads LLC ("SIL") is a Florida limited liability company with its principal place of business in Hollywood, Florida.  At all times material to this Class Action Complaint, SIL advertised, marketed, distributed and sold limited benefit plans and medical discount plans to consumers throughout the United States, including Class Plaintiffs and putative class members.  As Defendants reported in their SEC filings, SIL was actually formed by Defendants "and our third-party joint venture partner [Simple Health] in June 2013 . . . ." Defendants sold its interest in SIL to Simple Health in 2015.

23.     Senior Benefits One LLC ("SBO") is a Florida limited liability company with its principal place of business in Hollywood, Florida.  At all times material to this Class Action Complaint, SBO advertised, marketed, distributed and sold limited benefit plans and medical discount plans to consumers throughout the United States, including Class Plaintiffs and putative class members.

24.     Steven J. Dorfman ("Dorfman") was an owner, officer, member or manager of Simple Health Plans, HBO, HCM, ICC, SIL and SBO.

## FACTUAL BACKGROUND

**A.     Comprehensive Medical Insurance v. Limited Benefit Indemnity Plans and Medical Discount Plans**

25.     This case stems from fraudulent misrepresentations and omissions made for the purpose of leading consumers, including Class Plaintiffs and class members, to believe they were purchasing comprehensive medical insurance, when they instead were purchasing limited benefit indemnity plans, medical discount plans and other non-ACA-compliant products.

26.     Comprehensive medical insurance generally covers most if not all expenses incurred for events like doctor's visits, emergency room visits, hospital stays, lab services and prescriptions.  Insureds pay a premium, deductible and/or a copayment, and the risk of large medical expenses shifts to the insurer.

27.     Many comprehensive medical insurance plans comply with the ACA, 42 U.S.C. § 18001.  ACA-compliant plans cover preexisting conditions and emergency medical care, hospitalization, prescriptions, preventative care, maternity and pediatric care.  During the relevant time period, insureds with ACA-compliant plans were not required to pay the penalty imposed on those who afford such a plan but did not buy one.  The ACA is also called "Obamacare" and has certain enrollment periods and deadlines.

28.     One way to deliver comprehensive medical insurance plans is through a preferred provider organization ("PPO").  A PPO provides favorable coinsurance, copayments and reduced deductions to insureds who use a PPO's health network of preferred physicians and health systems.

29.     Limited benefit indemnity plans are much different than comprehensive medical plans.  With limited benefit indemnity plans, consumers receive predefined financial benefits after incurring medical expenses.  In other words, consumers purchase medical services at prenegotiated discount rates.  So if a limited benefit indemnity plan specifies a $50 per day benefit for hospital stays (similar to what Defendants and Simple Health sold), then the consumer is paid only $500 for a 10-day hospital stay that may cost tens of thousands of dollars. The risk of high or catastrophic medical bills falls completely on the consumer, in some cases leading to devastating financial consequences.

30.     Limited benefit indemnity plans are often combined with "medical discount

plans," which are not insurance and guarantee no medical coverage.  Medical discounts are like a "buyers club" or grocery store savings card.  With a medical discount plan, consumers generally pay a monthly fee to get discounts on specific services or products, such as dental and vision discounts, from participating providers.

31.    Limited benefit indemnity plans and medical discount plans are not major medical insurance and do not comply with the ACA.  If a consumer has only such plans, then he or she is subject to the ACA penalty.

**B.    Defendants and Simple Health Form Their Strategic Relationship**

32.    Defendants were founded in 2008 and became publicly traded on NASDAQ in 2013.  Defendants' revenue in 2018 was $351.1 million, of which nearly $160 million was generated from the sale of limited benefit indemnity plans and nearly $97 million was generated from medical discount plans and AD&D insurance.

33.    Simple Health was formed by Dorfman in 2012.

34.    Together, Defendants, Simple Health and their officers, employees and independent contractors created an associated-in-fact "enterprise," the purpose of which was to sell or distribute limited benefit indemnity plans, medical discount plans and other non-ACA-compliant products to consumers who thought they were purchasing comprehensive medical insurance (the "Enterprise").  Ultimately, the Enterprise would operate for more than five years, sufficient time to permit Defendants, Simple Health and their other associates to successfully pursue the Enterprise's purpose.

35.    As stated in Defendants' SEC filings, Defendants are not insurers.  Rather, Defendants to develop limited benefit indemnity plans and other products.  Defendants then market those products to consumers, primarily through third-party distribution channels.  The

Enterprise was comprised the largest of the external distribution channels that Defendants directed, managed and controlled — the channel that ran through Simple Health.

36.     In March 2013, Defendants and Simple Health entered into a Managing General Agent Agreement ("MGAA") allowing Simple Health to promote and sell various of Defendants' products, principally the limited benefit indemnity plans, medical discount plans and AD&D insurance.  Under the MGAA, Simple Health agreed to sell no other products than those developed or managed by Defendants.

37.     Under the MGAA, Defendants directed Simple Health's billing and premium collection services.  Defendants collected (and continue to collect) monthly payments from Simple Health customers.  Defendants provided an accounting of these payments and distributed a portion to Simple Health as commissions and a portion to the underlying insurance company or discount provider as a premium.  Defendants kept the balance for itself.

38.     Defendants also directed and performed other services for customers obtained through Simple Health, including the processing of enrollment forms, verification of eligibility for coverage, providing fulfilment documents to members, member support calls and other support activities.

39.     Defendants directed Simple Health to use Defendants' online platform, which Simple Health's agents used to quote and sell Defendants' products.

40.     Defendants and Simple Health also entered into a Master Commission Advance Agreement ("MCAA") in which Defendants financed Simple Health's business by advancing Simple Health's commissions prior to Simple Health earning them.  The MCAA essentially established a loan from Defendants to Simple Health in which Defendants repay themselves by withholding payments on future commissions earned by Simple Health.  As collateral, Simple

Health granted Defendants a security interest in Simple Health's assets, including but not limited to future commissions and accounts receivable, and Simple Health's principals, including Dorfman, provided personal guarantees.

41.     Buoyed by Defendants' financing, by September 2016 Simple Health employed 40 to 50 sales agents and about 35 customer service representatives out of its Hollywood, Florida, headquarters and satellite locations in Doral, Florida, and Boca Raton, Florida.   By 2018, Simple Health had more than 100 sales agents.

42.     Defendants benefited greatly as well.  Simple Health was Defendants' largest and most profitable third-party broker.   From 2014 through October 2018, HIIQ paid about $180 million in commissions to Simple Health.   By 2015, Simple Health was responsible for almost all of Defendants' limited benefit indemnity policy sales.  Defendants' 2016 annual report indicates that Simple Health accounted for more than 65% of advanced commissions paid.

## C.     The Enterprise's Scheme

43.     Defendants and Simple Health perpetrated a unified, common scheme whereby sales agents led consumers, including Class Plaintiffs and class members, to believe they would receive comprehensive medical insurance when, in reality, they received a combination of relatively worthless products that typically consisted of a limited benefit indemnity plan, a medical discount membership and AD&D insurance.

44.     As further described below, Defendants directed, knew about and substantially assisted the scheme, which was orchestrated to induce consumers through misleading websites and standardized and uniform scripts that sales agents were carefully trained to perform.

## D.     The Misleading Websites

45.     The sales process was tailored to mislead from beginning to end.   With

Defendants' financing, Simple Health paid search engines to direct consumers searching for specific words (or "AdWords") such as "Obamacare," "Obama Health Care," "Obama Insurance" and "Obama Care Insurance" toward one or more of Simple Health's 129 lead-generation websites.  Consumers searching for these words can reasonably be assumed to have been searching for ACA-compliant policies.

46.    The names of the lead-generation websites themselves were designed to mislead consumers into thinking that they were shopping for ACA-compliant plans.  They included addresses like "Obamacare-healthquotes.com," "myobamacareapplication.com," "healthinsurance2017deadline.com" and "healthinsurancedeadline2018.com."

47.    In addition, the websites featured logos of large, well-known insurance carriers like BlueCross, Anthem Blue, BlueShield, Aetna and Cigna, implying that comprehensive medical insurance was being sold.  The websites also used the logo of the American Association of Retired Persons ("AARP") despite no affiliation with, or permission from, the AARP.

48.    The website also used the Better Business Bureau ("BBB") logo, too, even though neither Defendants nor Simple Health had BBB accreditation.  In fact, the BBB processed dozens of complaints against both companies.  According to the Southeast Florida BBB's vice president for operations, the complaints share a common thread: that consumers "paid hundreds of dollars per month for what Simple Health telemarketers led them to believe would be a major medical health insurance policy but instead turned out to be a medical discount membership, indemnity policy, or similar product that did not provide the promised benefits or coverage."

**E.    A Standardized Sales Script Is Used to Fraudulently Induce Consumers**

49.    The contact information of potential customers, including Class Plaintiffs and class members, was obtained through these websites.  Consumers were then contacted by sales

agents.

50.     According to one sales agent, "[v]irtually every consumer I spoke to while employed at Simple Health was in search of a major medical insurance policy as well as some assurance that the policy would cover various pre-existing conditions and medications."

51.     Sales agents were provided with a carefully crafted, standardized script designed to mislead consumers, including Class Plaintiffs and class members, into believing they were being offered ACA-compliant insurance.  While a script was created for each limited benefit indemnity product, all were virtually identical.

52.     Sales agents were directed to follow the script verbatim.  Simple Health's quality control department monitored sales agents' calls and made written comments such as: "The agent needs to explain the benefits verbatim in order to provide the customer with the correct information," and "The Agent needs to read the post close verbatim in order to set the correct expectations, avoid cancellations and auto fails."

53.     Training materials urged sales agents to "STICK TO THE SCRIPT!!! . . .  History has proven to us that the best salespeople at Simple Health are the agents that stick to the script and have faith in the process. . . . The script keeps a consistent message across all departments."

54.     Simple Health's policy stated that any employee deviating from the script could be terminated.

55.     The script began, "Hello . . . I am going to be helping you with your application for an *affordable health insurance quote*." (emphasis added).  These words were intended to mislead consumers to believe that sales agents were pricing comprehensive medical insurance compliant with the Affordable Care Act.

56.     The script continued by instructing sales agents to tell the consumer "The name of

my company is Simple Health, and we represent most of the MAJOR "A Rated" CARRIERS in [your] state . . . .  So I'm able to give all of your options, and find you the BEST PLAN out there for the **BEST PRICE!**"  This statement was untrue, misleading consumers, including Class Plaintiffs and class members, to believe that agents were shopping for major medical insurance through an exchange that offered multiple options.

57.    The script then directed the sales agent to ask questions suggesting that they sought to help the consumer purchase comprehensive medical insurance.  Questions like whether the consumer was "currently insured?" and with what "insurance company?"  The script also asked the consumer to "verify any pre-existing medical conditions," and whether he or she has "ever been denied for health insurance."  The script omitted to tell consumers, including Class Plaintiffs and class members, that their answers to these questions would have no impact on whether they could buy the limited indemnity plans that were being sold.

58.    The script went on to state "we want to find you a PPO, that way you can keep your own doctors and hospitals.  I want to get you prescription coverage and lab coverage for your preventative care and maintenance."  But the plans were not PPOs.  They had no "preferred" network of providers with favorable co-insurance or co-pays that count toward a deductible.  Defendants and Simple Health were selling limited benefit indemnity plans and discount plans — networks of doctors and facilities offering preset discounts to members.  Unlike PPOs, these networks did not offer insurance, did not administer the plans and did not pay claims to doctors or providers within the network.  At best, the plans merely provided a discount, the level of which was not even known to the consumer prior to receiving care, making it difficult if not impossible for the consumer, including Class Plaintiffs and class members, to make informed choices.

16

59.     After obtaining the customer's personal information, the script directed the agent to say "Ok, I know exactly what you're looking for," and "I am going to submit your application" and "search" for the best plan.  The script contained a paragraph described as the "Fear of God paragraph," stating "Just so you know, . . . most insurance companies are VERY DISCRIMINATORY against pre-existing health conditions.  So I may not be able to get you approved for anything right now."  The script failed to tell consumers that no matter what the consumers' situations, they were going to be offered a limited benefit indemnity plan that would all but certainly be approved, and that the plan had a 12-month exclusionary period for pre-existing conditions.

60.     The script then instructed the agent to place the consumer on a brief hold, after which "we'll go over all of your options, if there are any, and make sure we find you the best plan for the best price."

61.     The script failed to tell the consumer, including Class Plaintiffs and class members, that the sales agent was not searching for different insurance options.  The agent was simply biding time to make it look like he or she was shopping among various plans.  (In fact, FTC recordings captured sales agents talking amongst themselves during the hold).  The sales agent was always going to offer the consumer a limited benefit indemnity plan, regardless of the consumer's specific needs.

62.     When the hold was lifted, the sales agent said:

(Their name)  I have some great news for you!  Based upon your application, I was able to get you approved into a plan in the state of (state).  This is an "A Rated" carrier and a PPO.  Do you know what a PPO stands for?  (*Regardless of answer, tell them!*)  PPO stands for Preferred Provider Organization, which simply means you can choose your own doctors and hospitals, and you don't need a referral to see a specialist.

63.     Again, these statements about a "PPO" from an "A Rated carrier" were untrue.

64.     The script continued with a paragraph "only for those with pre-existing conditions," stating "individuals like you can join this plan, and still qualify for this low rate. . . . What's the point of paying all that money every month if it's not going to cover the most important things, right???  **Exactly!!!**  This plan covers you from day 1 . . . ."  Again, the plan did not cover pre-existing conditions from day one.  There was a one-year pre-existing condition exclusion.  And even after a year, the plan offered only unspecified discounts for treatment of pre-existing conditions, not comprehensive coverage.

65.     The script continued, "Now, you can go to any doctor in the country" and "your insurance can be used at virtually ANY inpatient, or outpatient facility in the NATION."  But the limited benefit indemnity plans and discount plans developed by Defendants were not offered by every doctor in the country, nor were they accepted in most facilities.   Nor were they comprehensive medical insurance, as the script failed to mention.

66.     The script continued, "You will NEVER have ANY upfront costs on this PPO." On this point, the script failed to explain that not paying a copay or deductible did not ensure cost savings overall.  Indeed, an FTC expert has testified that the maximum annual value of the limited benefit indemnity plan was $3,200 for impatient hospital, outpatient clinic and emergency room care, and did not include pharmacy, dental, laboratory, imaging or vision insurance coverage.

67.     The script went on to make more misrepresentations that the consumer was buying into a PPO with no deductible:

> Now as you know MOST PLANS come with high deductibles that will have you paying THOUSANDS out of pocket BEFORE your insurance will pay for ANYTHING!!  This plan does not work that way.  This is a FIRST DOLLAR COVERAGE PLAN, which means THIS PLAN covers you from the MOMENT you enter the hospital.  So again, first the PPO network will take your entire hospital bill, and re-price.  (pause)  After the PPO network covers you, your plan

pays additional insurance benefits to help you cover the rest.  When all is said and done you end with pennies on the dollar if any cost at all!!  The whole idea of this plan is to make your out of pocket expenses as low as possible, without you EVER having to meet a deductible first.

68.     A straightforward example shows why these statements misrepresent the plans that were offered.  A patient who spends 14 days in the hospital and incurs a $30,000 medical bill receives $700 (or $50 for 14 days) under the limited benefit indemnity plan developed by Defendants and sold through Simple Health, leaving a bill of $29,300.  Comprehensive medical insurance with a deductible of $2,000 and out-of-pocket maximum of $7,500 would leave the patient with a bill of $7,500, with the insurer covering the rest.

69.     The script went on to throw in dental and vision coverage seemingly for free: "Now, for your benefit I have included an additional dental plan along with your policy.  This additional card gives you a dental and vision savings benefit which gives you more coverage than any other traditional insurance plan."  This statement was untrue.  The plan did not offer more coverage than a traditional dental and vision plan.

70.     The script continued, "Also, I have included additional insurance benefits such as Accidental Death AND an Accident Medical Expense plan along with your package."  But this additional "benefit" was not free.  In reality, consumers, including Class Plaintiffs and class members, were charged significant fees and premiums for this "included" coverage.

71.     The standard sales pitch claimed that plans included pharmacy coverage.  They did not.  The script nonetheless asked consumers what medications they took, in an effort to make it seem like its plans included pharmacy benefits.  The agents also quoted consumers the price of those medications, without telling the consumer that the agent was getting that price from a publicly available website, and not from a PPO or comprehensive medical plan.

72.     Again, never did the sales script direct the agent to tell consumers that they were

buying a limited benefit plan as opposed to comprehensive medical insurance.  These omissions, coupled with the affirmative misrepresentations in the script, were intended to induce consumers, including Class Plaintiffs and class members, to purchase the plan by leading them to believe they were buying comprehensive medical insurance.

**F.**      **Payment Is Taken and the Customer Is Read the Post-Close Script**

73.      Next, the sales agents took payment from the customer, including Class Plaintiffs and class members, using Defendants' web-based payment platform.  According to Defendants' most recent SEC Form 10-K, Simple Health used Defendants' platform to make payment and complete the enrollment process, taking "credit card and Automated Clearing House ("ACH") payments directly from members at the time of sale."  *See* Health Insurance Innovations Inc. Form   10-K,   at   5,   (March   13,   2019)   (found   at https://www.sec.gov/Archives/edgar/data/1561387/000156138719000004/hiiq-2018x12x31x10k.htm) (emphasis added).  Class members paid an enrollment fee of $60 to $175, along with their first monthly premium, typically between $40 and $700.

74.      After making payment, the sales agent employed the "post-close" portion of the script.  The post-close script instructed the agent to say "**CONGRATULATIONS** on your **NEW INSURANCE POLICY**!!"  This, again, suggested to the customer that they had just purchased comprehensive medical insurance.  And it also made clear that, at that point, the customer had already made the decision to purchase, and did purchase, the products.

75.      By design, the post-close script desensitized the customer to the coming "verification" process, a process designed to "walk back" some of the misrepresentations just made to the customer via the sales script.

76.      The post-close script undermined the verification process by telling the customer

20

that although the verification department would review the plan he or she just purchased, some of the verification information "WILL NOT APPLY TO YOU.  I just want you to know what parts affect you, and what don't; because they read the SAME SCRIPT to everyone."

77.     The post-close script instructed the agent to tell the customer to ignore the verification department's statements that the customer was not buying comprehensive medical insurance:  "Now, they **ALSO** will tell you that this is not a major medical plan OR **A DISCOUNT PLAN**.  Obviously this isn't a discount plan.  This **IS INSURANCE**."

78.     Again, these statements were untrue.  The plans were limited benefit indemnity plans and medical discount plans, not comprehensive medical insurance.

79.     The post-close script also instructed agents to suggest that the insurance covered preexisting conditions: "Now, fortunately for YOU, this IS a GUARANTEED ISSUE health insurance plan.  Because of the OPEN ENROLLMENT in your state, you're approved TODAY, regardless of your conditions."  The script then went on to tell the consumer not to heed the verification department's statements about limitations on preexisting conditions.  "On the Verification, they will state there is a 12/12 [one-year] preexisting clause that applies to your hospital and surgical benefits for any preexisting diagnosis you've had within the past 12 months.  Now because of this OPEN ENROLLMENT, you're approved today, REGARDLESS of those conditions."  Thus, the script misstated that the one-year preexisting conditions clause does not apply to the consumer.

## G.     The Verification Script Also Misled Customers

80.     Just before the sales agent sent customers from the post-close phase to the verification phase, the script instructed the sales agent to say: "IF YOU HAVE ANY QUESTIONS DURING THE VERIFICATION, DO ME A FAVOR, *IF YOU CAN*, AND JUST

HOLD THEM UNTIL THE END, BECAUSE THEY ONLY GIVE US A FEW MINUTES OF
TAPE TIME, AND IF THEY DON'T FINISH—THEY HAVE TO DO IT ALL OVER AGAIN
FROM THE BEGINNING, SO YOU CAN CALL ME BACK, OKAY?"

81.     This statement was untrue.  There was no issue with the amount of recording tape,
and questions would not have caused the verification process to start over.  In fact, if a question
was asked, the verification agent would turn off the recording before responding.  Sales agents
used a "verification rebuttal" script instructing them to provide different and conflicting answers
to customers' questions depending on whether the verification was "on recording" or "off
recording."  One "on recording" rebuttal script described the limited benefit indemnity plan as
"not health insurance," while the corresponding "off recording" rebuttal stated, "this is health
insurance."

82.     The statement had a fraudulent purpose: to discourage customers from asking
questions so that sales agents could obtain a clean recording of a verification script that was
inconsistent with what the customer had just been read in the sales script and post-close script.
Defendants were aware that, with few exceptions, Simple Health recorded only the verification
process and not the sales and post-close processes.

83.     The verification script instructed agents to tell customers that they had purchased
a "limited benefit plan" that was not traditional medical insurance.  Again, however, this
disclosure was made after the customer had made his or her purchase decision and paid for the
plan, and after the sales agent had read from a script designed to undermine the importance of the
verification process and its applicability to the customer.

84.     To the extent the sales pitches, post-close statements or verification statements
varied in a given phone call, they were nonetheless tied to standardized scripts and emanated

from uniform training procedures, and as a result did not materially vary among customers, including Class Plaintiffs and class members.  Everyone, including Class Plaintiffs and class members, received a common menu of fraudulent misrepresentations and omissions conveying a consistent message: that they were receiving a great deal on comprehensive medical insurance. In reality, in exchange for hefty up-front fees and monthly payments of hundreds of dollars, customers received relatively worthless limited benefit indemnity plans, medical discount plans and other ancillary products.

**H.**     **A Fiduciary Relationship Was Established**

85.     Simple Health knew that customers, including Class Plaintiffs and class members, were relying on Simple Health for assistance and protection.  As one former sales agent said, many did not have health insurance because they had lost their jobs or could not afford it.  Many had pre-existing conditions.

86.     Simple Health's customers, including Class Plaintiffs and class members, were vulnerable.  They relied on and trusted Simple Health, and Simple Health knew and encouraged that reliance and trust.

87.     Simple Health, using Defendants' distribution channels, purposely created a special, fiduciary relationship with its customers, including Class Plaintiffs and class members. The sales script directed the sales agent to investigate the customer's insurance needs by asking a series of personal questions.  It directed the sales agent to (at least pretend to) determine what coverages were available to meet the customer's needs, and to make a recommendation: "Your new PPO will cover everything you need AND be affordable at the same time.  This is ABSOLUTELY the best plan you'll receive in your price range."

88.     The script directed the sales agents to volunteer that the customer, including Class

Plaintiffs and class members, needed a "PPO, that way you can keep your own doctors and hospitals.  I want to get you prescription and lab coverage for your preventative care and maintenance. . . and MOST IMPORTANTLY, you want a plan that will have very low out of pocket expenses, right?"

89.    To further engender trust, the script touted Simple Health's expertise:

The name of my company is Simple Health, and we represent most of the MAJOR "A Rated" CARRIERS in the state of _____... So I'm able to give all of your options, and find you the BEST PLAN for the **BEST PRICE!**

****

Remember, I work with virtually EVERY PLAN available in your state, so if I thought there were ANYTHING OUT THERE that was more beneficial for you than THIS plan, then THAT is what I'd be offering you!  I take a lot of pride in what I do and I like to think that our relationship starts TODAY, okay?

90.    The script also directed the sales agent to make representations about the breadth of the coverage obtained:

You will receive doctor's visits, diagnostic testing for blood & lab work, 3 options of your medications, medical, surgical and hospital coverage with NO DEDUCTIBLE! . . .

****

You will NEVER incur ANY upfront costs on this PPO and your insurance can be used at virtually ANY inpatient, or outpatient facility in the NATION. . . .

****

Now, for your benefit I have included an additional dental plan along with your policy.  This additional card gives you a dental and vision savings benefit which give you more coverage than any other traditional insurance plan.  Also, I have included additional insurance benefits such as Accidental Death AND an Accident Medical Expense plan along with your package."

91.    In an attempt to deepen the special relationship between Simple Health and customers, the script encouraged customers to rely on Simple Health to answer questions and assist with the plans they purchased, touting Simple Health's superior licensing, knowledge and training:

24

> Again, (first name) although you were able to contact your carrier directly and they are very nice people, they literally get paid minimum wage to read the answers to your questions off a piece of paper.  Everyone here at Simple Health is fully licensed, trained on your policy, and here to help you.  Please keep in touch with us for any question or concerns about your plan.

92.    By encouraging and engaging its customers, including Class Plaintiffs and class members, in a special, fiduciary relationship, Simple Health triggered a duty to advise consumers, including Class Plaintiffs and class members, prudently about their coverage needs. That included a duty not to mislead them.

**I.    Class Plaintiffs and Class Members Relied as a Whole on the Misrepresentations**

93.    Given the nature of the misrepresentations and the materiality of the omissions, it can be legitimately inferred that Class Plaintiffs and class members reasonably relied on the statements made in the sales presentation.  The misrepresentation of plans as ACA-compliant, comprehensive medical insurance plans formed the basis of the consideration for which Class Plaintiffs' and class members agreed to purchase them.  The fact that those misrepresentations emanated from standardized scripts further shows reliance common to the entire class.

94.    Class Plaintiffs and class members were provided agreements that contained boilerplate language disclaiming that the plans included comprehensive medical coverage or were otherwise ACA-compliant.  But payment was made before customers received any disclaimers.  And by design, the presentation led customers, including Class Plaintiffs and class members, to misapprehend that the agreements told a different story than what the sales agents had conveyed through their standardized scripts.

95.    Thus, it can be easily presumed that customers, including Class Plaintiffs and class members, relied upon the misrepresentations and omissions during the sales and "post-close" processes, and not the verification process or boilerplate disclaimers that came afterward. The scheme was premised on getting borrowers to agree to and pay for the limited indemnity

plans before they received the disclaimers.

**J.      Victims Included the Class Plaintiffs**

96.      The scheme described above was applied to Class Plaintiffs.

97.      Elizabeth Belin.  Belin sought ACA-compliant coverage in early 2016.  A Google search of "individual health insurance plan" led her to one of Simple Health's websites that suggested it sold ACA-compliant insurance.  She entered her information on January 27, 2016, and received a call from a Simple Health sales agent later that day.

98.      Belin recalls that the agents, whose names Belin cannot remember but who can likely be identified through Simple Health's records, took Belin through the sales, post-close and verification scripts described above.

99.      The sales agent stated that Simple Health represented most of the large insurance companies in Ohio, and that he would shop among a number of PPOs to find the best one for Belin for the best price.  The sales agent told Belin that he was going to put her on hold to do the search.

100.      The sales agent came back on the line with "great news."  He offered Belin a "PPO" that he said provided insurance coverage for doctor's visits, prescriptions and Belin's pre-existing condition — a knee that would need replacement surgery — for $238.77 per month.  He told Belin that she could go to any doctor, including her knee specialist, at any location within the "network."  He said that the majority of her medical costs would be covered.

101.      The sales agent also told Belin that he would include AD&D and dental insurance.  He did not tell her that she would pay extra for those.

102.      The sales agent's representations led Belin to believe she was buying broad, comprehensive medical insurance.  In reality, she received limited benefit indemnity insurance

called Principle Advantage Limited Benefit Health Insurance (for $78.77), Freedom Spirit Plus AD&D insurance (for $130) and a dental discount plan (for $30).

103.    The sales agent processed Belin's credit card information and completed the purchase, which included an enrollment fee of about $150.  When done, he congratulated her on her new insurance policy.

104.    The sales agent told Belin that he would be transferring her to the "verification department," and that they would tell her things that did not apply to her.  He said that if she had any questions, she should hold them and call back.

105.    In November 2017, Belin had knee replacement surgery.  A few months later, she received a call from the hospital stating that only a fraction of her surgery and related expenses had been covered, and that she owed $48,000 (which was more than her annual salary as a paraprofessional).   In addition, Belin received other uncovered charges for anesthesiology ($3,000), rehabilitation ($4,600) and other incidentals.   Belin cancelled a second knee replacement surgery scheduled for the following Monday, then (with great difficulty) cancelled her "insurance."

106.    <u>Chris Mitchell</u>.  Mitchell also sought ACA-compliant coverage in early 2016.  A search for health insurance plans available through the ACA marketplace took him to a number of websites, including Simple Health's.  He inputted his information and received a call on January 13, 2016 from a sales agent named Chase.

107.    Chase said Simple Health represented most of the A-Rated carriers in Kansas and could give Mitchell "all his options" and "find the best plan for the best price."  Chase said he would find Mitchell a "PPO" that would allow Mitchell to keep his doctors and hospitals and provide prescription and lab coverage.

108.     Chase said he would put Mitchell on hold and then come back to "go over all your options."  When Chase returned, he told Mitchell "I did a search here for you" and was able to find a "PPO" from an "A-rated carrier."  Chase continued through the script, saying Mitchell would receive "doctor's visits, you know, diagnostic testing for blood and lab work, three options for your medications, medical, surgical and hospital coverage with no deductible, which is great."  He said there were "no limits on plan usage and a zero deductible."  None of this was true.

109.     Mitchell asked Chase to call back the next day, which Chase did.  Chase quoted Mitchell a $206.90 monthly premium and $155 enrollment fee.  Chase said this included insurance through the Multiplan Nationwide PPO Network ("Multiplan"), which "does also come with dental as well," along with vision and hearing.  In reality, these were dental, vision and hearing discount plans, and they were not free.

110.     Chase also failed to tell Mitchell that he was getting AD&D insurance, which Mitchell never asked for, or that Mitchell would be charged for it.  The name of the AD&D insurer was Companion Life Insurance Company ("Companion").

111.     Chase asked for, and Mitchell provided, Mitchell's credit card number.  Chase processed the payment and said "congratulations on your new insurance policy."

112.     Chase then transferred Mitchell to the verification department, but not before telling Mitchell "what they're going to do is just a brief recording for your protection and they'll go over the plan with you on the verification.  And just to let you know, you know, some of the information will apply to you, some of it will not apply.  You know, they just kind of read over the same script to everyone."  The verification agent quickly read to Mitchell the verification script and prompted Mitchell to say "yes" to various questions.

113.     In late February 2018, Mitchell was diagnosed with Invasive Ductal Carcinoma Grade 3.   His doctor ordered an immediate lumpectomy and sentinel lymph node biopsy. Surgery was quickly scheduled.   But just days before the surgery, Mitchell's hospital informed him that he did not have insurance coverage for the surgery.

114.     Mitchell contacted Companion, which referred him to Defendants.   Defendants referred him to Simple Health.   Simple Health assured Mitchell that his surgery would be covered.

115.     Mitchell then contacted Multiplan, which informed him that they were not an insurer but a repricing group.   Multiplan could not tell him anything about what coverage he would receive for the surgery.

116.     Mitchell's hospital contacted Simple Health to discuss surgical procedure codes. Simple Health informed them that procedure codes would only be considered *after* surgery. Thus, Mitchell would not know what coverage he might receive until after he incurred the cost of surgery.

117.     The hospital agreed to proceed for an upfront payment, which Mitchell paid via credit card.   After the surgery, he received bills exceeding $40,000, much of which he still owes.

118.     Mitchell, who works as an advocate for the homeless, was greatly impacted by what happened — financially, emotionally and physically.   He said that at times, the fight for insurance coverage felt more difficult than fighting cancer.

**K.     Defendants Knew About and Directed the Fraudulent Scheme**

119.     Defendants had actual knowledge of, and directed, the fraudulent scheme.

120.     Defendants' Role as Training and Compliance Monitor.   Defendants' SEC filings acknowledge that "[w]e provide the distributors with training, audit and other support, and

29

monitoring, and we continue to improve our distributor compliance."  Defendants' employees specifically provided call training and compliance monitoring to agents at Simple Health's headquarters in Broward County.  Defendants often stationed its employees in-house at Simple Health to oversee compliance and conduct compliance interviews of the sales agents.

121.   As part of this training and compliance process, Defendants' representatives reviewed the misleading script and at times directed or suggested edits to be made to those scripts.  Defendants' "Call Center Quality Department" monitored and critiqued the sales agents' presentations, which were read verbatim from the script.  Transcripts of those calls, and the Quality Department's critiques, were received, acknowledged and read by Defendants' Vice President of Sales, Amy Brady.  Defendants' representatives also discussed the script, and the sales pitches, with Simple Health's sales agents.

122.   <u>Defendants' Role as Third-Party Administrator</u>.  As third-party administrator, Defendants provided post-sale customer service to consumers who purchased limited benefit disability insurance through Simple Health.  As Defendants state in their SEC filings, Defendants managed the "non-claims related experience" of consumers signed up through Simple Health. Defendants also acknowledged in those filings that Defendants had received complaints from consumers that the information they were provided "was not accurate or was misleading."

123.   From the beginning of its relationship with Simple Health, Defendants received thousands of calls from consumers complaining that they had been led to believe they had bought comprehensive medical insurance through Simple Health.  Defendants categorized these complaints with the moniker "Agent Misrep."  The following chart shows the complaint types received by Defendants in 2018:

| Complaint Type | Total |
|---|---|
| Agent Misrep Obamacare (ACA) | 62 |
| Agent Misrep on Copay/Coinsurance/Deductible/Cash Benefits | 87 |
| Agent Misrep on Policy Coverages | 488 |
| Agent Misrep on Policy Type | 130 |
| Agent Misrep on Pre-existing Coverage | 28 |
| Agent Misrep on Providers in Network | 69 |
| Ancillary Continues to Bill after Core terminated (Agent) | 13 |
| Ancillary not Cancelled with Core (Agency) | 5 |
| Ancillary not Cancelled with Core (HII) | 5 |
| Ancillary Policy not Authorized | 71 |
| Information never received (agent) | 11 |
| Information never received (HII) | 9 |
| Member threatening regulatory complaint | 15 |
| Policy not authorized | 27 |
| Unable to Reach Agent | 5 |

124.     The following chart shows the complaint types received by Defendants in 2017:

| Complaint Type | Total |
|---|---|
| Agent Misrep Obamacare (ACA) | 384 |
| Agent Misrep on Copay/Coinsurance/Deductible/Cash Benefits | 171 |
| Agent Misrep on Policy Coverages | 944 |
| Agent Misrep on Policy Type | 258 |
| Agent Misrep on Pre-existing Coverage | 21 |
| Agent Misrep on Providers in Network | 102 |
| Ancillary Continues to Bill after Core terminated (Agent) | 25 |
| Ancillary not Cancelled with Core (Agency) | 22 |
| Ancillary not Cancelled with Core (HII) | 13 |
| Ancillary Policy not Authorized | 177 |
| Information never received (agent) | 15 |
| Information never received (HII) | 42 |
| Member threatening regulatory complaint | 62 |
| Policy not authorized | 95 |
| Unable to Reach Agent | 4 |

126.    The following chart shows the complaint types received by Defendants in 2016:

| Complaint Type | Total |
|---|---|
| Agent Misrep | 1146 |
| Agent Misrep Obamacare (ACA) | 33 |
| Agent Misrep on Copay/Coinsurance/Deductible/Cash Benefits | 47 |
| Agent Misrep on Policy Coverages | 170 |
| Agent Misrep on Policy Type | 53 |
| Agent Misrep on Pre-existing Coverage | 7 |
| Agent Misrep on Providers in Network | 5 |
| Agent Never Cancelled Policy | 287 |
| Ancillary Continues to Bill after Core terminated (Agent) | 2 |
| Ancillary not Cancelled with Core (Agency) | 5 |
| Ancillary not Cancelled with Core (HII) | 4 |
| Ancillary Policy not Authorized | 21 |
| Ancillary Product Billing | 5 |
| Benefits | 65 |
| Claims | 28 |
| Information never received | 79 |
| Member threatening regulatory complaint | 4 |
| Obamacare (PPACA) | 14 |
| Unable to Reach Agent | 1 |

127.    The following chart shows the complaint types received by Defendants in 2015:

| Complaint Type | Total |
|---|---|
| Agent Misrep | 224 |
| Ancillary Product Billing | 14 |
| Benefits | 6 |
| Claims | 9 |
| Unable to Reach Agent | 1 |

128.    As part of Defendants' role as third-party administrator, Defendants also processed thousands of refunds to customers seeking to cancel their limited indemnity plan because it was not what they thought they were purchasing.

129.    Defendants' Licensed Agents Worked in Simple Health's Broward County Office.  More than 40 sales agents working at Simple Health registered their licenses through Defendant HPIH.  Those agents saw and used the misleading scripts.

130.    Defendants Were Aware of the Misleading Websites. Defendants' employees and

32

agents also saw the misleading websites and their use of names like Cigna, Blue Cross and Aetna, as well as logos for the AARP and BBB. The limited indemnity products that Defendants sold through Simple Health were not offered through major healthcare insurers like Cigna, Blue Cross, Aetna and others.

131.    Defendants also knew that Simple Health did not have a positive BBB rating. The BBB complained to Defendants about the fact that Simple Health was generating numerous complaints about its business practices.

132.    <u>Defendants Received Numerous Inquiries From State Agencies Regarding Simple Health's Practices</u>. Defendants also knew about the sales practices because Defendants received extensive negative regulatory attention as a result of those practices.

133.    For example, in 2015 the state of Montana brought an action against Defendants and several of its agents, including HBO (Simple Health) and its licensed agent, Matthew Spiewak ("Spiewak"). Montana alleged, among other violations, that Defendants and its affiliated producers and licensees, including Simple Health and Spiewak, were "misrepresenting the terms of insurance policies at the time of sale."

134.    In 2016, the state of Arkansas issued a cease and desist order to Defendants alleging that Defendants and its agents, including Simple Health, "used fraudulent and dishonest practices in attempting to sell short-term health care plans."

135.    In mid-2017, the Pennsylvania Insurance Department's Bureau of Licensing and Enforcement (the "PIDBLE") began investigating Defendants based on complaints relating to complaints by customers who had been led to believe that they were buying ACA-compliant insurance. The PIDBLE determined that most of the products were administered by Defendants, and began investigating Defendants, and then investigated Simple Health as well.

136.     In 2016, the Florida Department of Financial Services ("FDFS") issued a Letter of Guidance admonishing Simple Health for using deceptive advertising that implied that Simple Health primarily sold ACA-compliant products, when most of the products it sold were indemnity products and discount plans that did not provide minimum essential coverage (or "MEC") required by Obamacare.  FDFS provided these Letters of Guidance to Defendants. Separately, the FDFS received 10 complaints about Simple Health and 45 complaints about Defendants since 2015 relating to sales practices.

137.     In 2017, Defendants were hit with a TCPA lawsuit in which the plaintiff alleged that HPIH's sales agents lure customers with brand names like Blue Cross but sell non-ACA-compliant plans of dubious value.  Those sales agents included Simple Health.

138.     In August 2018, the California Department of Insurance penalized Defendants, alleging that Defendants were "participating in deceptive sales practices by misrepresenting health polices to consumers."  Those practices were carried out by, among other agents, Simple Health.

139.     As a result of these and other state-led investigations, Defendants publicly disclosed in 2016 that they were "reviewing the sales practices and potential unlicensed sale of insurance by third-party distributor call centers utilized by" Defendants.

140.     Ultimately, Defendants have been investigated by more than 40 states relating to its distribution and sales practices.  In December 2018, just weeks after the FTC shut down Simple Health, Defendants entered into a regulatory settlement agreement with 43 states in which Defendants agreed to, among other conditions, require its external distributors to record all internal and external sales calls; prepare and implement a "disclosures plan" aimed at ensuring that consumers be made aware of policy details and fees at the time they purchase

insurance products; prepare and implement a "compliance plan" to monitor and improve sales practices; prepare and implement a "training plan" to train internal and external sales agents to comply with insurance laws; and pay a $3.4 million penalty.

**L.    Defendants Substantially Assisted the Ongoing Scheme**

141.    Defendants substantially assisted the ongoing misrepresentations and breaches of fiduciary duty to consumers, including Class Plaintiffs and class members, in numerous ways.

142.    Defendants Financed Simple Health's Operations.  Defendants financed Simple Health's operation in the form of loans that they called "advanced commissions."  In 2015 alone, Defendants loaned Simple Health more than $15 million.  That number increased each year.

143.    Without Defendants' financing of its commissions, Simple Health would not have been able to operate.  With Defendants' money, Simple Health thrived, which in turn generated millions of dollars in fees and premiums for Defendants.  Simple Health stated publicly that it had "an important, strategic relationship with" Defendants.

144.    Defendants Acted as Third-Party Administrator.  Defendants also acted as third-party administrator, collecting payments from consumers who purchased through Simple Health, accounting for those payments and then either distributing to Simple Health its commission or using that commission to pay down Defendants' loan.

145.    Defendants also directed other services for customers obtained through Simple Health, including the processing of enrollment forms, verification of eligibility for coverage, providing fulfilment documents to members, member support calls and other support activities.

146.    Defendants Directed Simple Health to Use Their Online Platform.  Defendants also provided Simple Health with access to Defendants' online platform, which Simple Health's agents used to quote and sell various products from Defendants' carriers.

147.   <u>Defendants Facilitated Simple Health's Licensing Requirements</u>.  Simple Health's licensing requirements were covered primarily by the license of its managing agent, Spiewak. When Spiewak resigned, Simple Health needed a replacement.  Defendants directed Simple Health's agents to become licensed through HPIH.

148.   <u>Defendants Paid Simple Health High Commissions</u>.  Defendants incentivized Simple Health's operations with extremely high commissions.  Defendants paid 45% to 60% of the consumer fees and premiums it collected to Simple Health, a much higher rate than were paid out for traditional insurance products.

149.   <u>Defendants Covered Simple Health's Legal Fees Arising Out of State Regulatory Investigations</u>.   Defendants and Simple Health's sales practices attracted numerous state regulatory investigations.  In some if not all such instances, including but not limited to the Montana investigation, Defendants paid for Simple Health's legal fees to address those investigations.

150.   Defendants also withheld significant relevant information from regulators.  For example, Massachusetts' attorney general filed a petition to force Defendants to provide sales scripts, recordings, consumer complaints and audits and "secret shopper" reports.  Massachusetts complained that Defendants had given "inadequate and incomplete" sworn testimony to investigators.

**M.   <u>Class Plaintiffs and Putative Class Suffered Damages</u>**

151.   <u>Class Plaintiffs and Class Members Pay Fees and Premiums</u>.  Relying on the misrepresentations, Class Plaintiffs and all class members paid an enrollment fee of between $60 and $175.  A portion of the enrollment fee went to Defendants, and the other portion to Simple Health.

152.    Also relying on the misrepresentations, Class Plaintiffs and class members paid a first monthly premium during enrollment ranging from $40 to $700.  A portion of the first monthly premium went to Defendants, another portion went to Simple Health and the remainder went to the plan providers.  Class Plaintiffs and class members then paid similar monthly premiums from there on.

153.    Belin paid an enrollment fee of about $150 and a monthly premium of $238.77. Mitchell paid an enrollment fee of $155 and a monthly premium of $206.90.

154.    Defendants have continued to bill and collect money from consumers even after the FTC shut down Simple Health in October 2018.  From December 2018 through February 2019, Defendants has charged customers 165,798 times, totaling approximately $14.6 million and resulting in commissions owed to Simple Health of $4.6 million.

155.    <u>Class Plaintiffs and Class Members Pay for Procedures and Medication That Would Have Been Covered by Comprehensive Medical Insurance</u>.  As a result of Defendants' and Simple Health's scheme, Class Representatives and class members suffered damages by paying for procedures and medication that would have been covered had they not been induced to purchase limited indemnity and medical discount plans, and instead purchased an ACA-Compliant plan.

156.    For example, Mitchell received more than $40,000 for surgery and medical bills arising out of his cancer diagnosis.  He received only $450 in benefits through Defendants' plan, despite paying nearly $5,000 in premiums over the previous two years.  Similarly, Belin received approximately $48,000 in medical bills relating to her knee surgery, which she continues to pay off.

N.    **The FTC Shuts Down Simple Health**

157.    On October 29, 2018, the FTC filed a lawsuit against Simple Health and Dorfman alleging misrepresentations in violation of the FTC Act.   Specifically, the FTC alleged that Simple Health misled consumers to believe they were buying comprehensive medical insurance instead of limited benefit indemnity plans and medical discount plans.

158.    On October 31, 2018, Judge Darrin Gayles of the U.S. District Court for the Southern District of Florida entered a temporary restraining order and appointed Goldberg as interim receiver to take control of Simple Health.

159.    Defendants terminated the MGAA and MCAA on November 2, 2018.

160.    On April 16, 2019, Judge Gayles held an evidentiary hearing on the FTC's motion for preliminary injunction.   On May 14, 2019, Judge Gayles entered an order granting the motion, and appointed Goldberg as permanent receiver.   The Court found that "[t]hough consumers believed they were purchasing comprehensive health insurance coverage, [Simple Health] sold them practically worthless limited indemnity or discount plans."

161.    The Court also found that Simple Health made numerous misrepresentations, including that i) the limited benefit indemnity plans were comprehensive medical insurance; ii) the limited benefit indemnity plans were qualified health insurance plans under the ACA; iii) Simple Health was an expert on, or provider of, government-sponsored health insurance policies; and iv) Simple Health was affiliated with AARP and major medical providers like BCBS.

**RICO ALLEGATIONS**

162.    Defendants, Simple Health and their officers, employees and independent contractors created an associated-in-fact Enterprise, the purpose of which was to sell or distribute limited benefit indemnity plans, medical discount plans and other non-ACA-compliant products

to consumers who thought they were purchasing comprehensive medical insurance.

163.    Throughout its existence, the Enterprise engaged in, and its activities affected, interstate commerce.  The Enterprise involved commercial activities across state lines, including marketing campaigns, phone solicitations and the solicitation and receipt of money from Class Plaintiffs and class members across the country.

164.    Defendants exercised substantial control over the Enterprise's the affairs, through among other methods and means, the following:

      a.    Developing the products to be sold;

      b.    Developing the third-party distribution channel that ran through Simple Health;

      c.    Loaning millions of dollars to Simple Health, its largest third-party distribution channel, to finance Simple Health's operations;

      d.    Training Simple Health's sales agents;

      e.    Monitoring compliance functions, including but not limited to monitoring sales calls;

      f.    Collecting monthly premiums from customers;

      g.    Accounting for, auditing and distributing the commissions and proceeds of those sales;

      h.    Dealing with and providing customer service to customers following those sales;

      i.    Reviewing and approving the scripts;

      j.    Controlling the delivery of "membership cards" to customers;

      k.    Allowing and coordinating dozens of Simple Health sales agents to

register their licenses through Defendants;

 l. Directing and paying for legal costs incurred by Simple Health arising out of regulatory investigations; AND

 m. Directing Simple Health to use Defendants' online platform to quote and sell Defendants' products.

165. Defendants were knowing and willing participants in the Enterprise and its scheme, and reaped revenues and/or profits therefrom.

166. Defendants have an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.  The Enterprise is separate and distinct from Defendants.

167. Defendants, who are persons associated-in-fact with the Enterprise, knowingly, willfully and unlawfully conducted or participated, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), (5) and 1962(c).  The racketeering activity was made possible by the regular and repeated use of the facilities, services, distribution channels and agents of the Enterprise.

168. Defendants committed multiple racketeering acts, including aiding and abetting such acts.  The racketeering acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims and methods of commission.  Further, the racketeering acts were continuous, occurring on a regular (daily) basis throughout a time period beginning in 2013 through November 2, 2018.

169. Defendants' predicate racketeering acts within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

a.    Mail Fraud.   Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the scheme, which used material misrepresentations and omissions to induce consumers, including Class Plaintiffs and class members, to purchase limited benefit indemnity plans, medical discount plans and other products.   The materials that Defendants sent or received include but were not limited to enrollment packets containing "membership cards," billing statements, customer service-related letters and customer payments.

b.    Wire Fraud.   Defendants violated 18 U.S.C. § 1343 by transmitting or receiving, or causing to be transmitted or received, materials by wire and/or email for the purpose of executing the scheme, which used material misrepresentations and omissions to induce consumers, including Class Plaintiffs and class members, to purchase limited benefit indemnity plans, medical discount plans and other products.   The materials transmitted and/or received include but were not limited to payment wires, interstate credit card transactions, invoices, customer service-related letters and emails promoting the scheme, such as introductory emails.

170.    In devising and executing the scheme, Defendants and their personnel committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343, in that they directed and carried out a scheme or artifice to defraud or obtain money by means of materially false misrepresentations or omissions.   For the purpose of executing the scheme, Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly, with the specific intent to advance the scheme.

171.    Defendants participated in the operation and management of the Enterprise by

41

directing its affairs, as described above.

## **CLASS ACTION ALLEGATIONS**

172.    Class Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class described as follows:

> All individuals residing in the United States who purchased Defendants' limited benefit indemnity plans through Simple Health on or after June 7, 2015.

173.    Excluded from the Classes are Defendants and their directors, officers, employees or independent contractors, or the former directors, officers, employees or independent contractors of Simple Health.

174.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets all the requirements of Rule 23(a)(1-4), including the numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

175.    <u>Numerosity</u>.  The members of the Class are so numerous that joinder of all members is impracticable.  Although Class Plaintiffs do not know the exact number of class members as of the date of filing, Defendants sold hundreds of thousands of limited benefit indemnity policies through Simple Health to class members throughout the United States.

176.    <u>Commonality</u>.  There are numerous questions of fact or law that are common to Class Plaintiffs and all the members of the Class.  Common issues of fact and law predominate over any issues unique to individual class members.  Issues that are common to all class members include, but are not limited to the following:

    (a)    Whether Defendants and Simple Health engaged in a single, common and scripted scheme whereby Simple Health's agents made uniform material misrepresentations and omissions to consumers, including Class Plaintiffs and

class members, to induce them to believe they would receive comprehensive medical insurance when, in reality, consumers received a limited benefit indemnity plan and/or medical discount plan;

(b)    Whether Defendants directed the scheme;

(c)    Whether Defendants had actual knowledge of the scheme;

(d)    Whether Defendants, despite actual knowledge of Simple Health's scheme, substantially assisted Simple Health;

(e)    Whether Simple Health had a fiduciary duty to consumers, including Class Plaintiffs and class members;

(f)    Where Defendants violated 18 U.S.C. § 1962(c);

(g)    Whether Class Plaintiffs and class members suffered damages;

(h)    Whether Defendants must disgorge the profits; and

(i)    Whether Class Plaintiffs and class members are entitled to treble damages, punitive damages, attorneys' fees and/or expenses.

177.    Typicality.  Class Plaintiffs have claims that are typical of the claims of all of the members of the Class.  Class Plaintiffs' claims and all of the class members' claims arise out of the same uniform and scripted scheme employed by Simple Health.  Furthermore, those claims arise under legal theories that apply to Class Plaintiffs and all other class members.

178.    Adequacy of Representation.  Class Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Class Plaintiffs do not have claims that are unique to Class Plaintiffs and not the other class members, nor are there defenses unique to Class Plaintiffs that could undermine the efficient resolution of the claims of the Class.  Further, Class Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel,

experienced in class action litigation, to represent it.   There is no hostility between Class Plaintiffs and the unnamed class members.   Class Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

179.   <u>Predominance</u>.   Common questions of law and fact predominate over questions affecting only individual class members.   The only individual issues likely to arise will be the amount of damages recovered by each class member, the calculation of which does not bar certification.

180.   <u>Superiority</u>.   A class action is superior to all other feasible alternatives for the resolution of this matter.   Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties.   The fees and premiums sought by Class Plaintiffs and class members are relatively small and unlikely to warrant individual lawsuits given the fees and costs, including expert costs, required to prosecute claims for those fees and premiums.

181.   <u>Manageability</u>.   This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a classwide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

<u>**COUNT I**</u>
**(Violation of RICO § 1962(c))**

182.   Class Plaintiffs incorporate the allegations of paragraphs 1 through 188 as if fully set forth herein.

183.   The Enterprise is engaged in, and its activities affect, interstate commerce.

184.   Defendants are entities capable of holding a legal or beneficial interest in property, and therefore each meet the definition of a culpable "person" under 18 U.S.C. § 1961.

185.     Defendants were associated with the Enterprise and conducted and participated in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

186.     The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

187.     Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that they committed and/or conspired to, or aided and abetted in the commission of, were related to each other and constituted a "pattern of racketeering activity."

188.     Defendants used thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the uniform misrepresentations and omissions made by Simple Health's sales agents to consumers, including Class Plaintiffs and class members.

189.     Defendants knew about and directed the material misrepresentations and omissions being made to consumers.  Defendants obtained money and property belonging to Class Plaintiffs and class members as a result of these violations.  Class Plaintiffs and class members have been injured in their business or property by Defendants' overt acts of mail and wire fraud.

190.     Class Plaintiffs and class members have been injured in their property by reason of Defendants' violations of 18 U.S.C. § 1962, including payment of the enrollment fee and monthly premiums, which collectively amount to tens of millions of dollars.  Class Plaintiffs and

class members have also been injured by paying for procedures and medication that would have been covered had they not been induced to purchase limited indemnity and medical discount plans, and instead purchased an ACA-Compliant plan.  In the absence of Defendants' violations of 18 U.S.C. § 1962, Class Plaintiffs and the Class would not have incurred these losses.

191.    Class Plaintiffs and class members' injuries were directly and proximately caused by Defendants' racketeering activity.

192.    Defendants knew and intended that Class Plaintiffs and class members would rely on the scheme's misrepresentations and omissions.  Defendants knew and intended that Class Plaintiffs and class members would pay fees and premiums, and would incur out-of-pocket costs for uncovered procedures and medication.

193.    Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action and to recover their treble damages, the costs of bringing this suit and reasonable attorney's fees.  Defendants are liable to Class Plaintiffs and class members for three times their actual damages as proved at trial plus interest and attorneys' fees.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendants that awards actual damages, treble damages and attorney's fees, and/or such other and further relief as the Court deems just and proper.

### COUNT II
**(Aiding and Abetting a Breach of Fiduciary Duty)**

194.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 188 as if fully set forth herein.

195. Defendants' distributor Simple Health fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

196. As set forth above, Simple Health breached those fiduciary duties by perpetrating a scheme that misled Class Plaintiffs and class members to believe they were buying comprehensive medical insurance.

197. Defendants substantially assisted in Simple Health's breaches of fiduciary duty with knowledge that Simple Health was breaching those duties.

198. As a direct and proximate result of Defendants' aiding and abetting Simple Health's breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Defendants' profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly-situated class members, respectfully demand judgment against Defendants for their damages; disgorgement of Defendants' profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT III
### (Aiding and Abetting Fraud)

199. Class Plaintiffs incorporate the allegations of paragraphs 1 through 188 as if fully set forth herein.

200. As set forth above, Simple Health perpetrated a fraud upon Class Plaintiffs and class members through materially false and misleading statements and omissions that misled Class Plaintiffs and class members to believe they were buying comprehensive medical insurance. Simple Health knew these statements to be false.

201.    The misrepresentations stemmed from standardized scripts presented by sales agents to Class Plaintiffs and class members.   Class Plaintiffs and class members reasonably relied to their detriment upon those misrepresentations, and purchased relatively worthless limited benefit indemnity plans and/or medical discount plans.

202.    Defendants substantially assisted Simple Health with knowledge that Simple Health was defrauding consumers like Class Plaintiffs and class members.

203.    In connection with providing substantial and material assistance to Simple Health, Defendants knew of their role in their scheme, and acted knowingly in assisting.

204.    Defendants substantially benefited from their participation in the scheme, earning millions of dollars of fees and other revenue from Class Plaintiffs and class members.

205.    As a direct and proximate result of Defendants' aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Defendants' profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly-situated class members, respectfully demand judgment against Defendants for their damages; disgorgement of Defendants' profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT IV
### (Unjust Enrichment)

206.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 188 as if fully set forth herein.

207.    Class Plaintiffs and class members conferred benefits upon Defendants in the form of fees and premiums paid to Defendants.

208.    Defendants knowingly and voluntarily accepted, and retained, those benefits.

209.    For the reasons described above, it would be inequitable for Defendants to retain those benefits, including profits derived from those benefits.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly-situated class members, respectfully demand judgment against Defendants for the return of the portion of fees and premiums retained by Defendants; disgorgement of Defendants' profits on fees and premiums; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Class Plaintiffs hereby demand a trial by jury on all allowable claims and forms of relief.

Dated:  June 7, 2019.                              Respectfully submitted,

LEVINE KELLOGG LEHMAN                   THE DOSS FIRM, LLC
SCHNEIDER + GROSSMAN LLP

By: /s/Jason Kellogg                           By: /s/Jason Doss
     Jeffrey C. Schneider, P.A.                     Jason R. Doss
     Florida Bar No. 933244                         Florida Bar No. 0569496
     Primary email: jcs@lklsg.com                   Primary email: jasondoss@dossfirm.com
     Secondary email: mt@lklsg.com                  (Application to District Court pending)The
     Jason K. Kellogg, P.A.                         Brumby Building
     Florida Bar No. 0578401                        127 Church Street, Suite 220
     Primary email: jk@lklsg.com                    Marietta, Georgia  30060
     Secondary email: mco@lklsg.com                 Telephone: (770) 578-1314
     Alexander Strassman, Esq.                      Facsimile: (770) 578-1302
     Florida Bar No. 111788
     Primary email: ags@lklsg.com
     Secondary email: ah@lklsg.com
     Tal Aburos, Esq.
     Florida Bar No. 1010901
     Primary email: ta@lklsg.com
     (Application to District Court pending)
     201 South Biscayne Boulevard
     Citigroup Center, 22nd Floor
     Miami, Florida  33131
     Telephone: (305) 403-8788
     Facsimile: (305) 403-8789