UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-61430-SINGHAL/VALLE

ELIZABETH BELIN, CHRISTOPHER
MITCHELL, KEVIN FURMAN, MITCHELL
KIRBY, GABRIELLE WATSON, and KATHRYN
SVENSON, JESSE MANLEY, RANDALL
SPITZMESSER, and MICHAEL ESCOBAR,
individually and on behalf of all others
similarly situated,

       Plaintiffs,

v.

HEALTH INSURANCE INNOVATIONS, INC.,
HEALTH PLAN INTERMEDIARIES HOLDINGS,
LLC, and MICHAEL KOSLOSKE,

       Defendants.
_____/

## ORDER ON MOTION FOR CLASS CERTIFICATION

Nine lead plaintiffs ("Plaintiffs"), individual consumers not covered by employer health plans, bring this putative class action against Defendants Health Insurance Innovations, Inc. ("HII") and Health Plan Intermediaries Holdings, LLC ("HPIH") (collectively, "Corporate Defendants") and Defendant Michael Kosloske ("Individual Defendant") (Corporate Defendants and Individual Defendant, together, "Defendants"). Plaintiffs allege Defendants' fraudulent scheme misled them and others into believing they were purchasing major medical insurance when, in reality, they were purchasing "limited benefit indemnity plans" and "medical discount plans" that, at best, defrayed a fraction of the out-of-pocket costs. Plaintiffs now seek class certification.

The parties have briefed this extensively and the Court has considered the following: Plaintiffs' Motion for Class Certification (DE [168]), Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification (DE [184]), Plaintiffs' Reply in Support of Motion for Class Certification (DE [194]), Defendants' Motion to Deny Class Certification (DE [167]), Plaintiffs' Response in Opposition to Defendants' Motion to Deny Class Certification (DE [182]), and Defendants' Reply in Support of Defendants' Motion to Deny Class Certification (DE [192]). For the following reasons, Plaintiffs' motion is **GRANTED**, Defendants' motion is **DENIED**, and class certification is **GRANTED**.

I.       **BACKGROUND**

A.       **The Class Claims**

Plaintiffs bring eight counts against Defendants primarily under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), as well as counts for breach of fiduciary duty and unjust enrichment. They accuse Defendants of developing the limited benefit indemnity and medical discount plans, as well as the distribution channels for those plans. The alleged distribution channels included two distributors: "Simple Health" and Donisi Jax, Inc., d/b/a Nationwide Health Advisors ("Nationwide Health"). Plaintiffs allege, among other things, that Defendants funded the sales operations at Simple Health and Nationwide Health, trained their sales agents, reviewed and edited the scripts used by their agents, provided an online platform for sales agents to quote and sell Defendants' insurance products, collected monthly premiums for plans sold by Simple Health and Nationwide Health, and accounted for and distributed "extremely generous commissions" for those sales. Further, Plaintiffs allege that the sales agents at Simple Health and Nationwide Health induced consumers to purchase

Defendants' products by reading a uniform script that misrepresented that they were purchasing a "PPO" from a reputable, "A-rated" insurance carrier when, in fact, they were purchasing "virtually worthless" limited benefit indemnity and medical discount plans.

**B.    The Lead Plaintiffs**

Each of the Lead Plaintiffs shares similar experiences in his or her dealing with Defendants and Simple Health or Nationwide Health.  The following are brief recitations of the Lead Plaintiffs' allegations against Defendants as taken primarily from the Third Amended Class Action Complaint (DE [176]):

**Elizabeth Belin** is a citizen of Ohio.  Belin had been recently divorced, was without health insurance, and suffered from a preexisting knee injury in early 2016 when she began looking for ACA[1]-compliant healthcare.  She happened upon one of Simple Health's websites, which Plaintiffs allege had "misleading names,"[2] when Simple Health's sales agent told her that he was shopping among numerous PPOs of "A-rated carriers," and would find the best one for Belin at the best price.  Plaintiffs allege that the sales agent, reading from a script, led Belin to believe she was buying "comprehensive" medical insurance.  However, what she purchased was a limited benefit indemnity plan and medical discount plan.  She paid an enrollment fee of $155 and a monthly premium of $238.77.  She later had knee replacement surgery, only to learn that the surgery was not

---

[1] *See generally* Patient Protection and Affordable Care Act, Pub. L. No. 111–148, 124 Stat. 119 (2010).

[2] According to Plaintiffs, the websites with misleading names included:
- obamacare-healthquotes.com;
- myobamacareapplication.com; and
- healthinsurance2017deadline.com.

covered.  She received bills in excess of $48,000, more than her annual salary, thousands of dollars of which she still owes.

**Christopher Mitchell** is a citizen of Kansas.  Plaintiffs allege he shared a similar experience.  His employer did not offer health insurance benefits.  He purchased a limited indemnity plan and medical discount plan from Simple Health in early 2016 after listening to a sales agent read from the sales script that Simple Health read to Belin and the other class members.  He paid a $155 enrollment fee and a $206.90 monthly premium.  In early 2018, Mitchell was diagnosed with an aggressive form of cancer and was immediately scheduled for surgery.  Just days before that surgery, Mitchell's hospital told him that he had no insurance coverage.  He ultimately received bills exceeding $40,000.

**Kevin Furman** is a citizen of Florida.  Plaintiffs allege that, in late 2017, Furman searched on the internet for "major medical inexpensive" and was led to a website containing a phone number for Nationwide Health.  Upon calling the number, the sales agent told Furman he would receive major medical insurance to protect against catastrophic health costs.  He paid an enrollment fee of $125 and a monthly premium of $437.54.  Furman continued to pay the monthly premium for about a year, when he was told by his new employer that the HII product he had purchased through Nationwide Health was not "health insurance."

**Mitchell Kirby** is a citizen of Arizona.  Kirby was in his early twenties in July 2016 when he sought his first health insurance policy.  He sought major medical insurance to protect him in the event of a catastrophic injury because of his self-described "active, outdoor lifestyle."  Through a Google search, Kirby found Simple Health's website. Plaintiffs allege that, after explaining this to a Simple Health sales representative, he was

given a quote for $149.67 a month.  However, according to Plaintiffs, nothing in this plan included "major medical insurance."  In April 2019, Kirby was involved in a motor vehicle accident.  He received bills of more than $35,000 for healthcare expenses that were not covered by the product he purchased through Simple Health.  HPIH collected $5,513.12 in fees and premiums from Kirby, refunding $179.67, for a total of $5,363.45.  Kirby paid $195.45 in out-of-pocket medical expenses.  He still owes an additional $46,867.39.

**Gabrielle Watson** is a citizen of South Carolina.  In early 2018, Watson, too, sought major medical insurance that would provide full coverage including coverage in the event of a catastrophic injury.  And, like Kirby, Watson stumbled on Simple Health's website through a Google search.  Upon contacting Simple Health, she explained what she was looking for to the sales representative.  Shortly thereafter, she was quoted $102.31 per month, but, as it turned out, nothing in the quote was for major medical insurance.  Watson paid an enrollment fee of $125 and the first monthly payment of $102.31 with a credit card.  She was then transferred to the verification department in which a representative asked her a series of questions and asked her to say "Yes" to each of them in succession.  She received an information packet directly from HII via email, and membership cards directly from HII via U.S. mail.  Watson later required medical treatment.  She received bills for medical expenses that were not covered by the product she purchased through Simple Health.  HPIH collected $1,966.58 in fees and premiums from Watson, refunding $102.31, for a total of $1,864.27.  She paid $349.32 in out-of-pocket medical expenses and owes an additional $6,964.88.

**Kathryn Svenson** is a citizen of Hawaii.  She, too, sought major medical insurance that would provide full coverage in the event of a catastrophic injury.  In July 2018, she

followed the same process as Watson, finding Simple Health through a Google search and explaining to the Simple Health representative that she wanted comprehensive major medical insurance. Simple Health quoted Svenson $167.52 per month, but, like Watson, nothing about the plan was major medical. Svenson paid an $125 enrollment fee and the first monthly payment of $167.52 with her credit card. She was then transferred to the verification department. In February 2019, Svenson required medical treatment for her finger due to a serious accident. She sought medical treatment, expecting it to be covered by insurance, but instead received bills of more than $5,000 for medical expenses that were not covered by the product she purchased through Simple Health. HPIH collected $2,135.24 in fees and premiums from Svenson. Svenson paid $120.66 in out-of-pocket medical expenses and owes an additional $4,738.90.

**Jesse Manley** is a citizen of Michigan. In 2017, Manley found a website with the logo of Blue Cross/Blue Shield. Upon calling the phone number listed on the website, however, he was directed to a Simple Health sales representative. During the phone call, Manley repeatedly asked if he was purchasing specifically a Blue Cross/Blue Shield insurance policy. The sales representative responded "yes" to the question every time. He was quoted $178 per month for a Unified National Health limited indemnity benefit product and an ancillary dental product, but none of it included major medical. Like the other Lead Plaintiffs, he paid an enrollment fee and his first monthly payment with his credit card. He was then transferred to the verification department.

In 2018, Manley suffered blood clots in his leg that required extensive testing. He sought medical treatment, expecting it to be covered by insurance, but instead received bills of nearly $1,500 for medical expenses that were not covered by the product he

purchased through Simple Health.  HPIH collected $4,272 in fees and premiums from Manley.  Manley paid $1,465.91 in out-of-pocket medical expenses.

**Randall Spitzmesser** is a citizen of Nevada.  A newlywed in early 2018, Spitzmesser searched online for health insurance for his wife and himself.  After he submitted background information, Simple Health contacted him by phone.  He specifically asked for comprehensive health insurance that included doctor's visits, prescriptions, lab costs, and dental and vision coverage.  The Simple Health sales representative responded that, because he was a newlywed, he qualified for "special benefits" under the ACA.  The sales representative quoted him $224.08 per month for a "Health Care Plus" limited indemnity benefit product (underwritten by American Financial Security Life Insurance Company) and Freedom Spirit Plus AD&D insurance.  He paid an enrollment fee of $125 and the first month's premium.  After Spitzmesser and his wife made separate doctors' visits, they received bills for services they initially were told were covered.  These expenses totaled $1,993.70, which he paid.  His wife's visit cost $438 and has been sent to a collection's agency.

**Michael Escobar** is a citizen of Florida.  In October 2016, Escobar was searching for major medical insurance for his wife, his son, and himself.  He spoke with a Simple Health sales representative who quoted Escobar $311.65 monthly for a health plan.  The representative told Escobar that the plan provided major medical coverage and would exempt him from the ACA tax penalty.[3]  He told Escobar that the plan was a "PPO," and that it afforded full coverage at a reasonable price because it was a "group" plan.  The

---

[3] The tax penalty associated with the "individual mandate" originally included in the ACA has since been repealed by Congress.  *See* Tax Cuts and Jobs Act, Pub. L. 115–97, § 11081(a)(2)(A), 131 Stat. 2054, 2092 (2017) (codified as amended at 26 U.S.C. § 5000A(c)(3)(A) (2018)).

plan, however, was actually a limited indemnity benefit product, not major medical.  He

paid a $125 enrollment fee and his first monthly payment with his credit card.  He was

then sent verification papers and told to electronically sign them.  In total, he incurred

more than $1,000 in uncovered medical bills and paid HPIH more than $6,000 in fees and

premiums.

### C.    The Proposed Class

Plaintiffs seek to represent the following classes and subclasses of consumers

subjected to the alleged health-insurance scheme by HII, Simple Health, and Nationwide

Health:

> Simple Health Class.  All individuals who purchased the HII Defendants'
> limited benefit indemnity plans and/or ancillary products such as medical
> discount plans through Simple Health within the applicable statute(s) of
> limitation, and paid fee(s) and/or a premium(s) that were not completely
> recovered through a refund or chargeback.

> Nationwide Health Class.  All individuals who purchased the HII Defendants'
> limited benefit indemnity plans and/or ancillary products such as medical
> discount plans through Nationwide Health within the applicable statute(s) of
> limitation, and paid fee(s) and/or a premium(s) that were not completely
> recovered through a refund or chargeback.

> Medical Expense Subclass.  All individuals within the Simple Health Class
> or Nationwide Health Class who incurred uncovered medical expense(s).

> Tax Penalty Subclass.  All individuals within the Simple Health Class or
> Nationwide Health Class who incurred a penalty under the ACA's individual
> mandate provisions.

The Simple Health Class includes seven of the eight Plaintiffs, and the Nationwide Health

Class is represented by Kevin Furman.  They have now moved for class certification.

## II.    LEGAL STANDARD

A district court is afforded broad discretion in deciding whether to certify a class.

*Joffe v. GEICO Indem. Ins. Co.*, 2019 WL 5078228, at *1 (S.D. Fla. July 31, 2019).

However, this discretion is not unfettered.  Our case law instructs that a court must engage in a "rigorous analysis," *Ohio State Troopers Ass'n v. Point Blank Enters., Inc.*, 347 F. Supp. 3d 1207, 1217 (S.D. Fla. 2018), and "the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation," *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016).

Federal Rule of Civil Procedure 23 controls the inquiry.  To begin, the proposed class must satisfy an implicit ascertainability requirement as well as the following four explicit factors in Rule 23(a):

(1)   the class is so numerous that joinder of all members is impracticable;

(2)   there are questions of law or fact common to the class;

(3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)   the representative parties will fairly and adequately protect the interests of the class.

And, as noted, Rule 23(a) implicitly requires that the class be "adequately defined and clearly ascertainable."  *Ohio State Troopers Ass'n*, 347 F. Supp. 3d at 1217.

If the proposed class satisfies the four factors of numerosity, commonality, typicality, and adequacy, as well as the implicit requirement of ascertainability, it must then demonstrate entitlement to class relief under one of the three provisions in Rule 23(b).  *See Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1279 (11th Cir. 2000).  The proposed class here seeks certification under Federal Rule of Civil Procedure 23(b)(3), which provides that "the court finds that the questions of law or fact common to class

members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

## III.   DISCUSSION

### A.   Standing Requirement for Class Certification

The Court must first address the "threshold matter" of the Plaintiffs' standing to represent the putative classes. *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000); *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) ("Any analysis of class certification must begin with the issue of standing."). "[O]nly after" the Court makes this determination "should it address the question whether the named plaintiffs have representative capacity . . . to assert the rights of others." *Ohio State Troopers Ass'n*, 347 F. Supp. 3d at 1218. This inquiry is of significant consequence when considering the implications of a lead plaintiff's lack of standing: "A named plaintiff in a class action who cannot establish the requisite case or controversy between himself and the defendants simply cannot seek relief for *anyone—not for himself*, and not for any other member of the class." *Griffin*, 823 F.2d at 1483 (emphasis added). In essence, the implications of this analysis can be equal to a motion to dismiss; if a lead plaintiff lacks standing to bring claims, he or she cannot sustain an action at all. *See, e.g.*, *Griffin v. Singletary*, 17 F.3d 356, 358 (11th Cir. 1994).

#### 1.   Legal Framework for Standing

Article III of the United States Constitution requires three elements that form the "irreducible constitutional minimum" for standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable

to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). An injury "must be . . . distinct and palpable, and not abstract or conjectural or hypothetical." *Lujan*, 504 U.S. at 560. "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Redressability tests "whether a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 n.5 (1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)). "[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)).

## 2.     Defendants' Arguments Against Plaintiffs' Standing

### a.     The McCarran-Ferguson Act and reverse preemption does not implicate Plaintiffs' standing because it is an affirmative defense.

First, Defendants argue that Plaintiffs lack standing to bring their RICO class claims because of the so-called doctrine of reverse preemption under the McCarran-Ferguson Act ("MFA"), *see* 15 U.S.C. § 1012(b). The MFA provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." *Id.* Thus, in a reversal of the typical doctrine of federal preemption, in such circumstances, the MFA preserves "the business of insurance" to the states and expressly provides that state law preempts the federal law.

Though well and thoroughly briefed by both sides, Defendants' argument is entirely inapposite and must be disregarded.  Reverse preemption is an affirmative defense, *Becks v. Emery-Richardson, Inc.*, 1990 WL 303548, at \*2 (S.D. Fla. Dec. 21, 1990), which does not implicate a plaintiff's standing to sue, *see, e.g., A & M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 291 F. Supp. 3d 1318, 1335 (S.D. Fla. 2017), *rev'd and vacated on other grounds*, 925 F.3d 1205 (11th Cir. 2019); *see also Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006) ("[T]he in pari delicto doctrine does not implicate a plaintiff's standing to sue but, rather, constitutes an affirmative defense.").

This is so for several reasons.  First, "[s]tanding is a jurisdictional inquiry," *Am. Civil Liberties Union of Fla., Inc. v. Dixie Cty.*, 690 F.3d 1244, 1247 (11th Cir. 2012), the absence of which completely bars a plaintiff from bringing her claims, *Griffin*, 823 F.2d at 1483.  Conversely, "an affirmative defense is generally a defense that, if established, requires judgment for the defendant *even if* the plaintiff can prove his case." *Vasquez v. Maya Publ'g Grp., LLC*, 2015 WL 5317621, at \*1 (S.D. Fla. Sept. 14, 2015) (emphasis added).  Standing is determined "prior to and independent of the merits of a party's claims . . . [and] in no way depends on the merits of the [party's] contention that particular conduct is illegal." *A & M Gerber Chiropractic LLC*, 291 F. Supp. 3d at 1335.  Second, the respective burden on the parties renders fruitless Defendants' attempt to defeat Plaintiffs' standing by arguing an affirmative defense.  Plaintiffs bear the burden of proving standing, and Defendants bear the burden of proving their affirmative defenses.  *Id.* ("GEICO, as the defendant, bears the burden of proving any affirmative defenses while Plaintiff bears the burden of proving standing."); *see also Am. Civil Liberties Union of Fla., Inc. v. Dixie Cty.*, 690 F.3d at 127.

Defendants' argument on reverse preemption may well be suited for a later motion. It is not clear at this time because it is not appropriate for the Court to opine on such a matter at this juncture.  However, it *is* clear that the discussion is irrelevant to Plaintiffs' standing and not appropriate on class certification.

> **b.     Plaintiff Jesse Manley does not lack standing simply because he alleges purchasing "ancillary benefits."**

Defendants next argue specifically that Plaintiff Jesse Manley lacks standing to pursue his claims because he "received his fulfillment documents from another entity" and because HII administered the collection only of his premiums.  Plaintiffs first respond that Defendants cite no evidence in support of this contention.  This is correct.  From the Court's view, there is no record evidence to support this whatsoever.

Defendants then contend that Manley "did receive fulfillment documents from HII relating to his ancillary dental plan.  And he made payments to HII on both his limited medical and dental plans."  Looking for the ah-ha moment, Defendants reply that "Plaintiffs concede that Manley only purchased an ancillary benefit . . . . This however is not a case about ancillary purchases."  The Court cannot agree.  As discussed in further detail below, Plaintiffs' inclusion of the term "ancillary products" in the class definitions is allowable and proper.  Plaintiff Jesse Manley has adequately met his burden as to standing.

> **B.     Class-Certification Factors Under Rule 23(a)**

Having found standing for Plaintiffs to bring claims, the Court now turns to the Rule 23(a) factors for class certification.  The Court begins with the implicit requirement of ascertainability then moves to the four explicit requirements of numerosity, commonality, typicality, and adequacy.

### 1.  Ascertainability

"Before considering Rule 23's explicit requirements, the Court must determine whether the proposed class has been adequately defined and is ascertainable." *Reyes v. BCA Fin. Servs., Inc.*, 2018 WL 3145807, at *9 (S.D. Fla. June 26, 2018).  A class is ascertainable where "the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way." *Id.*  "Identifying class members is administratively feasible when it is a 'manageable process that does not require much, if any, individual inquiry.'" *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015) (quoting *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014)).

In support of class certification, Plaintiffs argue that HII's records contain not only the identities of class members, but also the products they purchased and the payments they made.  As for the Medical Expense Subclass, Plaintiffs argue these members can be feasibly ascertained by notice to the main classes with a description of the subclass and an invitation to those who believe they suffered uncovered medical expenses to submit supporting documentation such as invoices, payments, or affidavits.  Similarly, according to Plaintiffs, members of the Tax Penalty Subclass—individuals who purchased from Simple Health or Nationwide Health and incurred uncovered medical expenses— can submit tax records showing payment of the penalty.  On the other hand, between their motion and their briefing in opposition to Plaintiffs' motion, Defendants raise several arguments on ascertainability.  Each will be discussed in turn.

        **a.**       **The proposed classes are "too broad and too vague, and would require excessive individual determinations."**

Defendants insist the subclasses are "too broad and too vague" to satisfy ascertainability. Take, for instance, the Medical Expense Subclass. According to Plaintiffs, this class is comprised of individuals who suffered damages by paying for medical expenses that *would have been covered had they* not been induced to purchase limited benefit indemnity and medical discount plans, and *instead purchased an ACA-compliant plan* like they intended. Thus, as Defendants frame it, membership in this subclass is appropriate where an individual: (1) incurred a medical expense; (2) that *would have* been covered; (3) by an ACA-compliant plan; and (4) that the member *would have* otherwise chosen to purchase. Defendants argue this proposed subclass is not administratively feasible as there is "no apparent mechanism for determining membership." In their view, this subclass requires one first to assume that Plaintiffs could have afforded an ACA-compliant plan, and also to determine that Plaintiffs, in fact, would have purchased such an ACA-compliant plan during open enrollment. The "what if" is an unknown that would require another individualized inquiry into each individual's state of mind and choice at the time of their purchase to ascertain if they would have made the decision to purchase the considerably more expensive "ACA-compliant plan" and be willing to pay the premium amount offered to them. In sum, Defendants argue that "a class cannot be certified on baseless speculation and need for individual inquiry."

Plaintiffs' response is short, but compelling. They respond: Defendants' position ignores class members' ability to self-identify, especially in this case where their membership in one of the main classes is already established by HII's own records. In *Karhu v. Vital Pharmaceuticals, Inc.*, 621 F. App'x 945 (11th Cir. 2015), the Eleventh

Circuit recognized "potential problems" with self-identification as a way to establish ascertainability.

> On the one hand, allowing class members to self-identify without affording defendants the opportunity to challenge class membership provides inadequate procedural protection to defendants and implicates their due process rights. On the other hand, protecting defendants' due-process rights by allowing them to challenge each claimant's class membership is administratively infeasible, because it requires a series of mini-trials just to evaluate the threshold issue of which persons are class members. A plaintiff proposing ascertainment via self-identification, then, must establish how the self-identification method proposed will avoid the potential problems just described.

*Id.* at 948–49 (internal citations omitted). It is *Karhu* on which Defendants rely in arguing allowing self-identification here would result in mini trials.

The Court cannot agree. In fact, in a later per curiam opinion from the Eleventh Circuit, the court recognized that "'file-by-file ***review***' does not necessarily amount to 'file-by-file ***trial***.'" *Ocwen Loan Servicing, LLC v. Belcher*, 2018 WL 3198552, at \*4 (11th Cir. June 29, 2018) (emphasis added). The court reasoned that "[t]he mere possibility that some individual disputes might arise does not show the clear abuse of discretion necessary to make out '*substantial* weakness' in the district court's decision [to certify the class]." *Id.*

Allowing self-identification here, in proposed classes that Plaintiffs insist are in the hundreds of thousands is not only administratively preferable but protects every interested party's due-process rights. This would not require mini trials. For instance, members of the "Tax Penalty Subclass"—individuals who purchased from Simple Health or Nationwide Health and incurred uncovered medical expenses—can be ascertained simply by submitting proof of tax records showing payment of the penalty.

**b.   The term "ancillary products" is not so vague and unspecified that it precludes class certification.**

Defendants next argue the putative classes fail the ascertainability requirement because the class definitions include purchasers of "vague and unspecified 'ancillary products.'"  According to the class descriptions, Plaintiffs seek to certify a nationwide federal racketeering class that includes all individuals who purchased HII's "limited benefit indemnity plans **and/or** ancillary products"[4] through Simple Health and Nationwide Health.  Thus, in their view, a purchaser within this class definition may include one who purchased a limited benefit indemnity plan—a specific, highly regulated, and federally recognized insurance product—*and* it may also include one who purchased "ancillary products," which Plaintiffs do not define or specify in the class description.  *See Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 660 (M.D. Fla. 2001) (a class definition cannot leave one guessing as to who can possibly be a member of a class, and a class definition as vague as the proposed one would create "significant manageability problems for the court").

Plaintiffs say it is simple to identify "ancillary products."  They are non-ACA-compliant products that do not constitute major medical insurance.  They could be medical discount plans or AD&D insurance and they are often "combined with limited benefit indemnity plans."

While not necessary in a class-certification posture, other courts have been presented the term "ancillary products" and have found them to be understood.  *E.g.*, *Rey v. Lafferty*, 990 F.2d 1379 (1st Cir. 1993); *Soranno v. Heartland Payment Sys., LLC*, 2020 WL 5652469, at *3 (D.N.J. Sept. 23, 2020); *Novo Nordisk v. Eli Lilly & Co.*, 1999 WL

---

[4] Emphasis added.

1094213, at *11 n.40 (D. Del. Nov. 18, 1999) (defining "pharmaceutical" as including "ancillary products" with a finite list of things).  This Court will not preclude class certification based on a term that is reasonably understood in the context of health insurance.

### c.   Plaintiffs are not "expanding" the scope of the proposed class at this stage by including the term "ancillary products."

Next, Defendants argue that Plaintiffs are improperly attempting to "expand" the scope of the proposed class by "now, at the certification stage" proposing to include the term "ancillary products."  They cite to *Bouton v. Ocean Properties, Ltd.*, 322 F.R.D. 683, 693–94 (S.D. Fla. 2017).  This argument puzzles the Court to some extent.  First, the Court has already reviewed these class definitions.  In Plaintiffs' Motion for Leave to File Third Amended Class Action Complaint (DE [144]), Plaintiffs proposed amending the class definitions to include the words used above.  The Court granted the motion to the extent Plaintiffs sought to amend the class definitions.  *See* Order 4 (DE [174]) (granting in part and denying in part).  Therefore, it is curious that Defendants insist Plaintiffs "now, at the certification stage" seek to include the term "ancillary products" in the class definitions.

Second, in that order, the Court wrote that, despite its granting Plaintiffs the relief of amending the class definitions, "there [was] a question as to whether Plaintiffs would even need the Court to grant leave to amend the class definition."  This Court cited to *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 680 n.1 (S.D. Fla. 2008), where the court adopted the amended class definition contained in the motion for certification, which differed from the class definition in the complaint.  The Court rejects Defendants'

argument that Plaintiffs **cannot** amend the class definitions here.

> **d.   Plaintiffs do not necessarily need to show each member of the proposed classes' standing or individualized inquiries.**

While the Court addressed the Lead Plaintiffs' standing above, Defendants raise two arguments regarding standing for *each member of the proposed class* and tie the issue to ascertainability.   First, they argue that ascertainability requires the proposed classes to be defined in such a way that *anyone and everyone* within a class would satisfy standing.   *See Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012). While the Court takes no issue with the general position that plaintiffs must satisfy standing—indeed, Article III standing is a bedrock principle of federal subject-matter jurisdiction—Defendants misread *Walewski*.   In *Walewski*, "[a]fter it denied class certification, the district court dismissed [the] complaint for lack of standing."   *Id.* at 862. In other words, the court dismissed the complaint based on the ***lead plaintiff's*** lack of standing.   *Id.*   The court's standing analysis was limited to the lead plaintiff; class certification failed on its own, separate analysis—chiefly, the class was "not clearly defined."   *Id.*

Case law from the Eleventh Circuit stands at odds with the rigid standard Defendants propose regarding *each* member of the putative class.   In fact, as the Eleventh Circuit held in *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019):

> A plaintiff need not prove that every member of the proposed class has Article III standing prior to certification, and in some cases a court might reasonably certify a class that includes some putative members who might not have satisfied the requirements of *Lujan* and decide to deal with the problem later on in the proceeding, but before it awarded any relief.

The Court is satisfied that—at this stage—the putative classes do not fail

ascertainability under *Cordoba*.  Plaintiffs may rely on generalized evidence of reliance among all class members.  Plaintiffs set forth significant direct and circumstantial evidence to show that those who purchased limited medical plans were misled and suffered injury.  This is not a case, like those cited by Defendants, where a determination of class membership requires individualized inquiries into subjective areas like whether plaintiffs "had their cruise ruined," *see Conigliaro v. Norwegian Cruise Line Ltd.*, 2006 WL 7346844, at *4 (S.D. Fla. Sept. 1, 2006), or even objective questions like whether plaintiffs signed an arbitration agreement, *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012).[5]

The second argument raises the issue of individualized inquiries for each member of the classes.  Plaintiffs seek to certify a "medical expense" subclass of individuals that consists of all those "within the Class who incurred *uncovered* medical expenses."  They allege that they "suffered damages by paying for medical expenses that would have been covered had they not been induced to purchase limited benefit indemnity and medical discount plans, and instead purchased an ACA-compliant plan."  Thus, membership in this subclass is appropriate where an individual (1) incurred a medical expense (2) that would have been covered (3) by an ACA-compliant plan (4) that the member would have chosen to purchase at the time of their purchase of HII's products.  Defendants argue this is not administratively feasible because the putative subclass and definition are so numerous that it must fail certification.  But the Court has already rejected this in the discussion above.

---

[5] Further, the Court is unconvinced by out-of-district cases cited by Defendants.  *See, e.g.*, *Diakis v. Comcast Corp.*, 2013 WL 1878921, at *4 (N.D. Cal. May 3, 2013) (proposed class not ascertainable because it included every purchaser "irrespective of whether he or she was deceived").

2.      **Numerosity**

A proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no specific threshold," *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007), and it is generally a "low hurdle" for a lead plaintiff to make an initial showing, *Manno v. Healthcare Rev. Recovery Grp., LLC*, 289 F.R.D. 674, 684 (S.D. Fla. 2013). *See also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009) (writing that a lead plaintiff "bears the burden of making some showing" that the class is too numerous for individual claims). Here, the putative class purports to represent more than tens of thousands. This is more than sufficient to establish numerosity without further comment. Indeed, Defendants do not even appear to contest this factor.

3.      **Commonality**

While commonality and typicality are similar, they differ in one key aspect: Commonality "refers to the group characteristics of the class as a whole [while] typicality refers to the individual characteristics of the named plaintiff in relation to the class." *Cooper v. S. Co.*, 390 F.3d 695, 713–14 (11th Cir. 2004) (alteration in original), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006); *see* Fed. R. Civ. P. 23(a)(2), (3). Although neither factor "mandates that all putative class members share *identical* claims," *Cooper*, 390 F.3d at 714 (emphasis added), the lead plaintiffs must still, at the very least, share "the same essential characteristics as the claims of the class at large," *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985). Like numerosity, "[t]he threshold for commonality is not high." *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D. Fla. 2003).

Plaintiffs argue the following four questions go to the heart of their six claims and are capable of common resolution: (1) Whether defendants conducted the affairs of an enterprise through a pattern of racketeering activity; (2) whether the class was subjected to a common scheme of misrepresentations and omissions; (3) whether HII knew about the scheme and substantially assisted it; and (4) whether Simple Health had a fiduciary duty to plaintiffs and class members.

In *Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1356 (11th Cir. 2006), the Eleventh Circuit recognized that RICO claims "are often susceptible to common proof," holding that RICO claims, by their very nature, raise common questions that focus on the existence of a scheme rather than whether individual plaintiffs were wronged. *Id.* Moreover, commonality "is generally satisfied when a plaintiff alleges that defendants have engaged in a standardized course of conduct that affects all class members." *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 536 (S.D. Fla. 2015). In addition to raising common questions that focus on a scheme, RICO claims likewise raise questions of a standardized course of conduct.

### 4.    Typicality

"Rule 23(a)(3) requires that the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Bouton v. Ocean Props., Ltd.*, 322 F.R.D. 683, 698 (S.D. Fla. 2017). "[T]he claim of a class representative is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Id.* (internal quotation omitted). This requirement "serves one simple purpose: to assure that the named representatives' interests are aligned with those of the class." *Singer v. AT&T Corp.*, 185

F.R.D. 681, 689 (S.D. Fla. 1998). Class plaintiffs' claims need not be "substantially identical" to those of the class members. *In re Checking Account Overdraft*, 275 F.R.D. 666, 674 (S.D. Fla. 2011). Typicality can exist "despite substantial factual differences . . . when there is a strong similarity of legal theories." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009).

Plaintiffs contend their claims and class members' claims arise "squarely" from the same pattern or practice and rest upon the same legal theory—that they stem from a uniform scheme in which they were misled to believe they were buying comprehensive medical insurance. They point to ten facts about the sales process, which they contend show "was the same for each Plaintiff":

(1) Each Plaintiff searched online for comprehensive medical insurance.

(2) After filling in information on a website they found or calling a number on a website, Plaintiffs spoke to a sales agent for Simple Health or Nationwide Health on the phone.

(3) The sales agent asked Plaintiffs what they could afford.

(4) The sales agents then told each Plaintiff that the agents had a plan that would meet all their needs and that the plans were comprehensive in nature.

(5) The sales calls were lengthy, typically lasting between 45 minutes to an hour.

(6) At the end of the sales call, Plaintiffs all submitted their payment information.

(7) Plaintiffs received disclosures and verified their enrollment, either by electronically signing documents or by verifiers over the phone.

(8) Plaintiffs were led to believe that the verifications/disclosures were confirming what the sales agent told them over the course of the lengthy sales call.

(9)    Each Plaintiff believed they had purchased major medical insurance.

(10)   During the sales calls, the agents did not disclose that the plans did not
       comply with the ACA.

The Court is satisfied that typicality is well met.

### 5.    Adequacy

In the Eleventh Circuit, Rule 23(a)'s adequacy requirement compels the Court to assess "(1) whether any substantial conflicts of interest exist between the representatives and the class, and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).  In other words, class certification is precluded "where the . . . interests and objectives of the named representatives differ significantly from the . . . interests and objectives of unnamed class members."  *Id.* at 1190.  The Court sees no issues with this factor.  Neither party even contends there is a "fundamental conflict" between Plaintiffs and the putative class members.

### C.    <u>Class Certification Under Rule 23(b)(3)</u>

Finally, with Plaintiffs having satisfied all requirements under Rule 23(a), the Court must now address Rule 23(b).  Again, Plaintiffs seek class certification under paragraph (b)(3): "A class action may be maintained if Rule 23(a) is satisfied and if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This is a conjunctive test; both prongs must be satisfied.  *Vega*, 564 F.3d at 1277 ("Rule 23(b)(3) requires findings *both* (1) 'that the questions of law or fact common

to class members predominate over any questions affecting only individual members,'
and (2) 'that a class action is superior to other available methods for fairly and efficiently
adjudicating the controversy.'").

> The rule sets forth four specific (though non-exclusive)
> considerations pertinent to these findings:
>
> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy
> already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of
> the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.* (quoting Fed. R. Civ. P. 23(b)(3)(A)–(D)).  The Eleventh Circuit has instructed district
courts that a rigorous analysis is required and failure to engage in such constitutes an
abuse of discretion.  *Id.* ("[T]he district court engaged in virtually no Rule 23(b)(3) analysis
at all. . . . [The district court's] conclusory statement, which cannot truly be called analysis,
is grossly insufficient and easily rises to the level of an abuse of discretion.").

### 1.    Questions of Law or Fact Common to Class Members Versus Individual Members

Common issues of law or fact predominate where they have a "direct impact on
every class member's effort to establish liability that is more substantial than the impact
of individualized issues in resolving the claim or claims of each class member." *Carriuolo
v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016).  To show predominance, "it is not
necessary that all questions of law or fact be common, but only that some questions are
common and that they predominate over the individual questions."  *Sanchez-Knutson*,
310 F.R.D. at 537.

Here, Plaintiffs must show that common issues predominate several analyses in this case: reliance, fiduciary duty, and damages, as well as the overarching RICO claims. The latter is satisfied easily: The Eleventh Circuit has held multiple times "the common issues of fact in a RICO action, concerning the existence of an enterprise and a pattern of racketeering activity are quite substantial.  They would tend to predominate over all the most complex individual issues."  *Williams,* 568 F.3d at 1357.

This commonality also weighs in favor of class certification to the extent that the rule requires the Court to balance "the class members' interests in individually controlling the prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  That the Eleventh Circuit has described the commonality of RICO's factual issues as "substantial" leads the Court to weigh this factor heavily in favor of class certification and against individual claims.

### 2.    Class Action As Superior to Other Available Methods of Adjudicating the Controversy

"The superiority inquiry focuses on 'whether there is a better method of handling the controversy than through the class action mechanism.'"  *Cty. of Monroe v. Priceline.com, Inc.*, 265 F.R.D. 659, 671 (S.D. Fla. 2010) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004)).  "[T]he conclusion that common issues of law and fact predominate . . . strongly militates in favor of a class action as a superior means of litigating."  *Id.* at 671–72.  This inquiry is closely related to the commonality inquiry under Rule 23(a).  *See Williams*, 568 F.3d at 1358 ("[W]here a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.").

Further, Plaintiffs point to their respective damages being "relatively small" in support of superiority.  *See Carriuolo*, 823 F.3d at 989 (superiority met where "individual claims may be too small for a separate action by each class member"); *Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 675 (S.D. Fla. 2012) ("Since the damage amounts allegedly owed to each individual defendant are relatively low . . . the economic reality is that many of the class members would never be able to prosecute their claims through individual lawsuits.").

Defendants' position against superiority is unpersuasive.  First, they argue that proximate cause requires an individualized analysis.  In other words, Plaintiffs must establish that the claimed racketeering activity (the misrepresentations made by the respective sales representatives) was the proximate cause of *each* of the plaintiffs' injuries.  They insist Plaintiffs cannot do this by class-wide proof.  But the Court rejects this argument as untenable.  If this were so, no cause of action that includes the element of proximate cause would be proper for class certification.

Next, Defendants extend the same premise to the element of reliance.  But the Court rejects this argument, too.  Plaintiffs' reliance may be inferred on a class-wide basis, *see Klay*, 382 F.3d at 1259, primarily because Plaintiffs allege that each of them received the same message from the sales representatives.  Defendants' attempt to distinguish each Plaintiff's experience simply falls short and, were the Court to agree with Defendants' position, would eviscerate class-action claims under any cause of action that includes an element of reliance.

### 3.   Choice-of-Law   Considerations   Affecting   Predominance, Manageability, or Superiority

There is one final consideration, but because of its vast scope, the Court has separated it into its own discussion.  The RICO claims in this action are governed by federal law and apply to all class members nationwide.  However, there is a choice-of-law analysis to be had on Plaintiffs' common-law claims.  And this choice-of-law issue could potentially affect the above analysis because in cases where the law of multiple states applies, "the plaintiffs face an uphill battle in obtaining certification of a nationwide class."  *See In re Photochromic Lens Antitrust Litig.*, 2011 WL 13141933, at *3 (M.D. Fla. Oct. 26, 2011).  The question, of course, is *whether* the laws of multiple states apply here. This heavy burden is on Plaintiffs.  *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010).  And Florida conflict laws apply to determine which state's substantive laws apply.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

Florida conflict law applies the Restatement, Second's "significant relationship test."  *See Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).  This test states:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [section] 6.

> (2) Contacts to be taken into account in applying the principles of [section] 6 to determine the law applicable to an issue include:

> (a) the place where the injury occurred,

> (b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.* (quoting Restatement (Second) of Conflicts of Laws § 145).  Each of these four factors is discussed in turn.  In sum, the Court finds the factors weigh in favor of Florida and Plaintiffs.

### a.      The injury occurred in Florida.

Not surprisingly, the parties disagree on the location of the alleged injury.  Plaintiffs argue the injuries occurred in Florida; Defendants argue they occurred "in the localities of each of the Plaintiffs."  Plaintiffs are correct.  Because Plaintiffs and class members paid their fees and premiums to HII in Florida, the injury occurred in Florida.

### b.      The conduct causing the injury occurred in Florida.

As far as the second factor, the conduct causing the injury occurred in Florida, as well.  Defendants do not dispute this, either.  Simple Health sales representatives spoke with Plaintiffs and class members primarily from Simple Health's offices in South Florida.  Nationwide's representatives did, too.   HII sent Plaintiffs and class members their fulfillment packets, by wire and mail, from HII's Tampa offices.

### c.      Defendants are domiciled in Florida.

Defendants are all located in Florida.  Plaintiffs and class members are located in forty-two states and the District of Columbia.  Plaintiffs argue that this factor is neutral.  Defendants do not dispute this.

> **d.  The relationship between Plaintiffs and class members and Defendants is "centered" in Florida.**

"[I]f other important contacts, such as the place of injury or the place of conduct or the domicil or place of business of the parties, are also located in the state," then that state is likely to be where the relationship is centered.  Restatement (Second) Conflict of Laws § 145 cmt. e.  Plaintiffs argue that, because the injury occurred in Florida, the injurious conduct occurred in Florida, and Defendants each reside in Florida, the parties' relationship finds its center in Florida, as well.  The Court agrees.

## IV.  CONCLUSION

Plaintiffs have satisfied the requirements for class certification.  Therefore, Plaintiffs' motion (DE [168]) is **GRANTED**, Defendants' motion (DE [167]) is **DENIED**, and class certification is **GRANTED.**

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 1st day of February 2021.

_____
RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies to counsel via CM/ECF